Grace Jun (SBN 287973)
grace@gracejunlaw.com
501 West Broadway, Suite 1480
San Diego, CA 92101
Tel: (310) 709-4012

John Fattahi (SBN 247625)
jfattahi@gmail.com
LAW OFFICE OF JOHN FATTAHI
21250 Hawthorne Blvd, Suite 500
Torrance, CA 90503
Tel: (424) 999-5579

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| THE ESTATE OF ABDUL KAMARA by and through its successor in interest FREDRIKA NABBIE, and FREDRIKA NABBIE, in her own right,<br><br>      Plaintiffs,<br><br>      vs.<br><br>COUNTY OF SAN DIEGO; ALEJANDRO AGUILERA, in his individual capacity; TYLER PHILLIPS, in his individual capacity; CHRISTOPHER ABERLE, in his individual capacity; CARLOS HEARD, in his individual capacity; TRAVIS KAAPKE, in his individual capacity; DERRICK JONES, in his | Case No. 25cv0226 AJB VET<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT [Dkt. 22]**<br><br>Date:      August 14, 2025<br>Time:      2:00 p.m.<br>Ctrm:      4A<br><br>*The Hon. Anthony J. Battaglia* |

individual capacity; KLAYTON LIEKKIO, in his individual capacity; CITY OF VISTA; SHANE APPLEGATE, in his individual capacity; VINCENT COREY, in his individual capacity; JACOB HAPROFF, in his individual capacity; BRYON LAMORANDIER, in his individual capacity; and DOES 1-10 and 15-50,

Defendants.

Case No.  25cv0226 AJB VET
OPPOSITION TO MOTION TO DISMISS FAC

TABLE OF CONTENTS

I.    Introduction ........................................................................... 1

II.   Allegations of the First Amended Complaint.................................. 2

    A.   Defendants were called to help Abdul Kamara obtain
       emergency medical care but ended up causing his death........ 2

    B.   The County's customs and practices caused Kamara's
       rights to be violated. ................................................... 5

    C.   The County's deficient training caused Kamara's rights
       to be violated. .......................................................... 7

III.  Legal standard under Rule 12(b)(6) ................................................ 7

IV.   Argument .............................................................................. 8

    A.   Plaintiffs adequately pled their Fourth Claim for *Monell*
       municipal liability...................................................... 9

       1.   County Defendants' motion ignores one custom
          and fails to show that the other two could not
          plausibly cause the violations...................................... 10

       2.   The FAC plausibly alleges that the County's
          failure to train caused the constitutional
          violations............................................................. 12

       3.   County Defendants' motion ignores Plaintiffs'
          collective inaction *Monell* theory.................................. 14

    B.   The Estate adequately pled its Fifth Claim for violation
       of the Bane Act......................................................... 15

    C.   Plaintiffs should be allowed to identify Doe Defendants
       21-50 through discovery............................................... 17

    D.   Alternatively, Plaintiffs request leave to amend. .................. 24

V.    Conclusion ........................................................................... 24

# TABLE OF AUTHORITIES

## Cases

*A.B. v. Cnty. of San Diego,*
No. D084376, __ Cal. App. 5th __ (Jun. 26, 2025) ........................... 5

*Aguirre v. City of San Antonio,*
995 F.3d 395 (5th Cir. 2021) ........................................................... 14

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ...................................................................... 1, 8

*Audrey G. v. City of Lafayette,*
No. 21-CV-03545-WHO, 2022 WL 16528143 (N.D. Cal. Oct. 28,
2022) ............................................................................................... 21

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) .......................................................................... 8

*Board of Cnty. Comm'rs v. Brown,*
520 U.S. 397 (1997) ........................................................................ 13

*Boyd v. Benton Cnty.,*
374 F.3d 773 (9th Cir. 2004) .......................................................... 20

*Branch v. Tunnell,*
14 F.3d 449 (9th Cir. 1994) ....................................................... 10, 22

*Butler v. Nat'l Cmty. Renaissance,*
766 F.3d 1191 (9th Cir. 2014) ........................................................ 21

*Castro v. Cnty. of Los Angeles,*
833 F.3d 1060 (9th Cir. 2016) .......................................................... 9

*City of Canton v. Harris,*
489 U.S. 378 (1989) ................................................................... 12, 13

*Connick v. Thompson,*
563 U.S. 51 (2011) .......................................................................... 13

*Conservation Force v. Salazar,*
646 F.3d 1240 (9th Cir. 2011) .......................................................... 8

*Cornell v. City and Cnty. of San Francisco,*
17 Cal. App. 5th 766 (2017) ....................................................... 15, 16

*Drummond ex rel. Drummond v. City of Anaheim,*
343 F.3d 1052 (9th Cir. 2003) ........................................................ 14

*Dubner v. City of San Francisco,*
266 F.3d 959 (9th Cir. 2001) .......................................................... 20

*Eminence Capital, LLC v. Aspeon, Inc.*,
316 F.3d 1048 (9th Cir. 2003) .......................................................... 24

*Fairley v. Luman*,
281 F.3d 913 (9th Cir. 2002) ............................................................ 15

*Foman v. Davis*,
371 U.S. 178 (1962) .......................................................................... 24

*Garlick v. Cnty. of Kern*,
167 F. Supp. 3d 1117 (E.D. Cal. 2016) ........................................... 16

*Gibson v. Cnty. of Washoe*,
290 F.3d 1175 (9th Cir. 2002) ............................................................ 9

*Gillespie v. Civiletti*,
629 F.2d 637 (9th Cir. 1980) ...................................................... 17, 18

*Gomez v. JP Morgan Chase Bank, N.A.*,
No. 3:22-CV-01773-JAH-DEB, 2024 WL 2243243 (S.D. Cal. Mar. 26, 2024) ........................................................................................ 22

*Horton by Horton v. City of Santa Maria*,
915 F.3d 592 (9th Cir. 2019) ........................................................... 15

*Hunter v. Cnty. of Sacramento*,
652 F.3d 1225 (9th Cir. 2011) ......................................................... 11

*Ibrahim v. Fiat Chrysler Automobiles*,
No. CV1910744MWFPLAX, 2020 WL 7862122 (C.D. Cal. Nov. 19, 2020) ................................................................................................ 21

*James v. Lee*,
485 F. Supp. 3d 1241 (S.D. Cal. 2020) ............................................ 20

*Johnson v. City of Shelby*,
574 U.S. 10, 135 S. Ct. 346 (2014) .................................................. 10

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) ............................................... 22, 23, 24

*Kirkpatrick v. Cnty. of Washoe*,
843 F.3d 784 (9th Cir. 2016) ........................................................... 13

*L.A. Lakers, Inc. v. Fed. Ins. Co.*,
869 F.3d 795 (9th Cir. 2017) ............................................................. 8

*Lacey v. Maricopa Cnty.*,
693 F.3d 896 (9th Cir. 2012) ............................................................. 1

*Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*,
507 U.S. 163 (1993) .......................................................................... 10

*Lee v. City of Los Angeles*,
  250 F.3d 668 (9th Cir. 2001) ...................................................... 22, 23

*Los Angeles Cnty. v. Humphries*,
  562 U.S. 29 (2010) ................................................................................ 10

*M.H. v. County of Alameda*,
  90 F. Supp. 3d 889 (N.D. Cal. 2013) ................................................. 15

*Mendiondo v. Centinela Hosp. Med. Ctr.*,
  521 F.3d 1097 (9th Cir. 2008) .............................................................. 8

*Monell v. Dep't of Soc. Servs.*,
  436 U.S. 658 (1978) ..................................................................... passim

*Navarro v. Block*,
  250 F.3d 729 (9th Cir. 2001) ................................................................ 8

*Nehad v. Browder*,
  929 F.3d 1125 (9th Cir. 2019) ............................................................ 11

*Nunes v. Ashcroft*,
  375 F.3d 805 (9th Cir. 2004) .............................................................. 24

*Oviatt v. Pearce*,
  954 F.2d 1470 (9th Cir. 1992) ............................................................ 12

*Ownes v. Kaiser Found. Health Plan, Inc.*,
  244 F.3d 708 (9th Cir. 2001) .............................................................. 24

*Pembaur v. City of Cincinnati*,
  475 U.S. 469 (1986) ............................................................................. 10

*Reese v. Cnty. of Sacramento*,
  888 F.3d 1030 (9th Cir. 2018) ............................................................ 16

*Rodriguez v. County of Los Angeles*,
  891 F.3d 776 (9th Cir. 2018) .............................................................. 15

*Sandoval v. Cnty. of San Diego*,
  985 F.3d 657 (9th Cir. 2021) .............................................................. 13

*Scott v. Smith*,
  109 F.4th 1215 (9th Cir. 2024)............................................................ 16

*Shaw v. Dept. of Alcoholic Beverage Control*,
  788 F.2d 600 (9th Cir. 1986) .............................................................. 10

*Spencer v. Pew*,
  117 F.4th 1130 (9th Cir. 2024)............................................................ 14

*Starr v. Baca*,
  652 F.3d 1202 (9th Cir. 2011) ............................................... 8, 19, 20

*United States v. Reese,*
    2 F.3d 870 (9th Cir. 1993) .................................................................. 16

*Wakefield v. Thompson,*
    177 F.3d 1160 (9th Cir. 1999) ..................................................... 17, 18

### Statutes

42 U.S.C. § 1983 ............................................................................. passim

CAL. CIVIL CODE § 52.1 ...................................................................... 1, 15, 16

CAL. CODE CIV. P. § 474 ............................................................................ 21

CAL. W&I CODE § 5150 .............................................................................. 3

### Other Authorities

Ninth Cir. Model Jury Instruction 9.7 ..................................................... 12

### Rules

FED. R. CIV. P. 12 ....................................................................... 1, 7, 8, 19

FED. R. CIV. P. 15 ................................................................................ 21, 24

FED. R. CIV. P. 8 ...................................................................................... 8

FED. R. EVID. 1002 ................................................................................. 23

FED. R. EVID. 201 ................................................................................... 23

FED. R. EVID. 805 ................................................................................... 23

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.     Introduction

Plaintiffs, The Estate of Abdul Kamara and Fredrika Nabbie, respectfully oppose County Defendants' motion to dismiss the Fourth Cause of Action (the *Monell* claim against the County) and Fifth Cause of Action (violation of California's Bane Act, Civil Code § 52.1) of Plaintiffs' First Amended Complaint ("FAC"), pursuant to Federal Rule of Civil Procedure 12(b)(6), and to dismiss Does 21-50. County Defendants do not challenge the remainder of the FAC.

County Defendants request consideration of a Computer Aided Dispatch ("CAD") report to contravene the allegations of the complaint, yet they neither rely on the CAD report to challenge the Fourth and Fifth Causes of Action, nor challenge the § 1983 claims against the individual County Defendants. The CAD report is neither incorporated by reference into the FAC nor subject to judicial notice under Federal Rule of Evidence 201.

County Defendants' motion selectively omits and mischaracterizes Plaintiffs' allegations, while failing to acknowledge the high standard for dismissal at this stage. The FAC sufficiently pleads cognizable legal theories and provides ample factual allegations to support Plaintiffs' Fourth and Fifth claims. Moreover, reasonable inferences can be drawn from the allegations of the complaint to support Plaintiffs' claims. "*Iqbal* demands more of plaintiffs than bare notice pleading but it does not require us to flyspeck complaints looking for any gap in the facts." *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 924 (9th Cir. 2012) (internal citations omitted). Finally, Plaintiffs should be allowed a reasonable opportunity to identify Does 21-50 through discovery.

## II.     Allegations of the First Amended Complaint

### A.     Defendants were called to help Abdul Kamara obtain emergency medical care but ended up causing his death.

On March 3, 2024, in the sallyport of the Vista jail, Abdul Kamara lost his life while in the custody of law enforcement officers who had been called to help him obtain urgently needed medical care. FAC ¶ 1.

On March 2, Carlsbad paramedics had responded to a call from a concerned citizen about Kamara having a medical emergency. *Id.* ¶ 38. Kamara was paranoid, his pulse was fast, and his blood pressure was high. *Id.* He requested evaluation at a hospital, and paramedics took him to the emergency department ("ED") at Scripps Memorial Hospital in Encinitas, arriving shortly after 10 pm. *Id.* ¶¶ 38-39.

Kamara's thoughts and speech were paranoid, delusional, incoherent, and nonlinear. *Id.* His cognition and judgment were impaired. *Id.* The ED doctor intended to initiate "broad workup to include CT scan of [Kamara's] head" to attempt a diagnosis. *Id.*

While medical personnel were preparing to draw Kamara's blood, he ran out of the ED with no shirt or shoes. *Id.* ¶ 40. The hospital called 911 to request assistance, informing dispatch that Kamara was there for mental help, paranoid, incompetent, and unable to care for himself. *Id.* ¶ 41. Defendant-Deputies Aguilera and Phillips arrived at the hospital, and at 11:13 pm, the ED staff reiterated to them that Kamara was unable to care for his own safety or make appropriate medical decisions, and they needed to return him to the hospital for an emergency medical evaluation and a medical hold. *Id.* ¶¶ 42, 47.

Aguilera and Phillips failed to locate Kamara. *Id.* But at 11:45 pm, a gas station employee called 911 because Kamara was crawling around

the parking lot without a shirt or shoes, still wearing hospital garb. *Id.* ¶ 43. Another deputy arrived first and saw Kamara lying on the ground while having involuntary muscle spasms and talking nonsensically. *Id.* Aguilera and Phillips arrived at 11:55 and determined that Kamara was the "5150"[1] patient who had eloped from the ED.

Phillips handcuffed Kamara and placed him in the patrol vehicle. *Id.* ¶ 46. Kamara was compliant, cooperative, and polite. *Id.* At midnight on March 3, Aguilera and Phillips told dispatch they were taking Kamara back to the ED. *Id.* The hospital was one mile away, or a three-minute drive. *Id.* ¶ 48. Nonetheless, Aguilera and Phillips changed their minds and decided to arrest Kamara on suspicion of being under the influence of a controlled substance. *Id.* ¶ 47. At 12:22 am, they told dispatch they were taking Kamara to the Vista Detention Facility, which was about 18 miles away, instead of the hospital. *Id.*

At the jail, Kamara again exhibited bizarre behavior, including hitting his head, causing it to bleed. *Id.* ¶ 49. At 12:39 am, Kamara—who was 5 feet 6 inches tall and weighed only 136 pounds—either fell or was taken down by Phillips. *Id.* ¶¶ 1, 51. The Defendant-Deputies, along with Defendant Liekkio of the California Highway Patrol, restrained Kamara on the ground using bodyweight compression, downward pressure, and a WRAP device, restricting his ability to breathe for approximately seven minutes and constituting deadly force. *Id.* ¶¶ 1, 51, 100.

After the WRAP was applied, Defendants left Kamara unmonitored in a dangerous prone position that continued to restrict his breathing,

---

[1] CAL. W&I CODE § 5150 (permitting peace officer or medical professional to subject gravely disabled person to involuntary hold for assessment, evaluation, crisis intervention, or treatment).

contrary to proper training to use a position such as sitting upright that does not restrict breathing and monitoring, and to closely monitor him for signs of distress. *Id.* ¶¶ 2, 52, 100. Kamara complained of head and mouth injuries to the WRAP safety officer, who ignored him. *Id.* ¶ 87. Kamara's head had hit the concrete and he sustained a subarachnoid hemorrhage. *Id.* ¶¶ 2, 51. Twenty minutes passed with no medical care. *Id.* ¶ 3. None of the deputies provided medical aid or summoned jail medical staff. *Id.* ¶ 2. Defendants called for paramedics, and the three Vista Paramedic-Defendants arrived to Kamara at 1:13 am. *Id.* ¶ 53.

The Paramedic-Defendants found that Kamara's blood pressure and oxygen saturation were dangerously, abnormally low. *Id.* ¶¶ 3, 53. Even so, none of the Defendants loosened or removed any part of the WRAP. *Id.* ¶ 3. About five minutes later, while still prone and in the WRAP, Kamara was found to be not breathing and unresponsive. *Id.* ¶ 53. At 1:28 am, Paramedics documented that Kamara had no pulse and Defendants finally removed part of the WRAP so that CPR could commence, but it was too late and Kamara died at age 29. *Id.* ¶¶ 3, 53.

The deputies had been called to help Kamara get emergency medical care. *Id.* ¶ 97. They had no information he had committed any crime or harmed anyone. *Id.* ¶ 96. Kamara was cooperative and compliant with all directives and commands. *Id.* ¶ 98. He did not resist, attempt to flee, threaten anyone, or pose a threat or danger to anyone. *Id.* ¶¶ 98-99. He was unarmed, restrained, and outnumbered. *Id.* ¶ 100.

Both the Defendants' denial of medical care and their use of force were unreasonable, caused Kamara's civil rights to be violated, and caused him pain, suffering, and loss of life. *Id.* ¶ 91, 102. All Defendants were integral participants in these violations of Kamara's rights and/or failed to intervene to prevent them. *Id.* ¶ 102.

## B.      The County's customs and practices caused Kamara's rights to be violated.

The Sheriff's Department "has a custom and practice of depriving arrestees suspected of intoxication and mental illness of urgently needed medical care." *Id.* at 13 & ¶ 113. Arresting individuals who are intoxicated and also suffer from serious medical or mental health issues is a frequently recurring situation that County Sheriff's deputies encounter on a daily basis. *Id.* ¶ 61. The County was aware that its deputies frequently arrested and booked people exhibiting medical distress for being "under the influence." *Id.* ¶ 62.

This custom and practice had resulted in preventable deaths and serious injuries before Kamara's detention, including the deaths of Christopher Trujillo, Ronald Scimeca, Daniel Jordon, Bernard Victorianne, Hugo Barragan, Bruce Inge, Zdzislaw Bieruta, Ronnie Sandoval, Lucky Phounsy, Adrian Sanchez, Bruce Stucki, Ivan Prieto, Kristopher Birtcher,[2] Kenneth Rice, Paul Silva, Oscar Leal, Marco Rosales, Joseph Castiglione, Michael Bush, and Joseph Jimenez, all of whom were suspected of intoxication and died in Sheriff's custody. *Id.* ¶¶ 62, 113. All of these deaths occurred because deputies refused to first obtain emergency medical care and hospitalization for arrestees and

_____

[2] County Defendants note that federal claims arising from Birtcher's death were dismissed based on qualified immunity. However, on June 26, 2025, summary judgment was denied on all state claims in a published opinion by the California Court of Appeal, which held that (1) a reasonable jury could find that deputies' forcible prone restraint was excessive deadly force because Birtcher was in restraints and did not pose an immediate threat of serious bodily harm, and (2) there was a basis for the corresponding negligent training claim against Sheriff Gore. *A.B. v. Cnty. of San Diego*, No. D084376, __ Cal. App. 5th __ (Jun. 26, 2025), *at* https://www.courts.ca.gov/opinions/documents/D084376.PDF.

inmates, and instead criminalized their conduct and inflicted detention as extrajudicial punishment. *Id.* ¶ 63. Deputies sought to arrest these people and book them into jail to avoid further contact or having to escort them through the hospital process, instead of obtaining emergency medical care for them when they first exhibited signs of distress. *Id.* ¶¶ 63, 114. Thus, the County also had a longstanding custom of arresting people suspected of acute intoxication who need urgent medical care and booking them into jail without first sending them to a hospital for medical clearance, including treatment and stabilization. FAC ¶¶ 55, 62.

The County also maintained a custom and practice of encouraging its deputies to use restraints in an excessive and unreasonable manner that led to deaths—by refusing to conduct unbiased investigations, refusing to hold deputies accountable for using unreasonable force, refusing to correct known training and policy deficiencies, and creating a culture of apathy and impunity. *Id.* ¶¶ 69, 115. Before Kamara's detention, the County was on notice that deputies' unreasonable restraint methods were killing people, including Jeff Dewall, Tommy Tucker, Barragan, Phounsy, Mark Adkins, Birtcher, Silva, Leal, Rosales, and Jimenez. *Id.* ¶ 68. The County refused to discipline or retrain deputies who used unreasonable force against these people, and in the case of Leal, then-Sheriff Gore hotly disputed the Medical Examiner's classification of the death as a homicide related to the restraint. *Id.*

These deficient customs and practices amounted to deliberate indifference and were the moving force behind both the deputies' misconduct in this case and Kamara's injuries and death. *Id.* ¶ 119.

## C. The County's deficient training caused Kamara's rights to be violated.

The Sheriff's Department "failed to properly train, supervise, and discipline deputies who used unreasonable force and improper restraint methods." *Id.* at 20. Officers must be trained to avoid restraining techniques, such as application of pressure and body weight, that can block the flow of air into a person's lungs, which can contribute to positional, or restraint, asphyxia. *Id.* ¶ 65.

As of 2017, the County's training encouraged deputies to use the full body weight of multiple officers atop a prone person's torso, including with their knees, to restrain them or obtain compliance. *Id.* ¶ 66. Contrary to national standards and best practices, the County did not train deputies to minimize the amount of prone torso compression. *Id.* The County did not train its deputies on the "physiology of a struggle"—a person may struggle due to restricted breathing, and deputies should recognize they are trying to breathe better, not engaging in purposeful resistance, and avoid responding with more force that exacerbates the problem. *Id.* ¶ 67. Moreover, the deaths of Dewall, Tucker, Barragan, Phounsy, Adkins, Birtcher, Silva, Leal, Rosales, and Jimenez placed the County on notice of the obvious need for further training on proper restraint methods to avoid more deaths. *Id.* ¶¶ 70, 116-17.

The failures to properly train deputies amounted to deliberate indifference and were the moving force behind both the deputies' misconduct in this case and Kamara's injuries and death. *Id.* ¶ 119.

## III.   Legal standard under Rule 12(b)(6)

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted 'tests the

legal sufficiency of a claim.'" *Conservation Force v. Salazar*, 646 F.3d 1240, 1241-42 (9th Cir. 2011) (quoting *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).

"[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also L.A. Lakers, Inc. v. Fed. Ins. Co.*, 869 F.3d 795, 800 (9th Cir. 2017) ("[W]e accept the factual allegations of the complaint as true and construe them in the light most favorable to the plaintiff."). A claim is plausible on its face when the complaint pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). "If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011), *cert. denied*, 132 S. Ct. 2101 (2012).

## IV.   Argument

The FAC states plausible, non-speculative claims for the County's § 1983 municipal liability and for County Defendants' violation of the Bane Act, and against Does 21-50. "Rule 8(a) '*does not impose a probability requirement at the pleading stage;* it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence' to support the allegations." *Starr*, 652 F.3d at 1217 (quoting *Twombly*,

550 U.S. at 556). Here, the FAC provides fair notice of these claims, and plausibly alleges sufficient facts that it would not be unfair to subject County Defendants to discovery on the underlying facts.

Plaintiffs are not required to satisfy any heightened pleading requirement, such as that for allegations of fraud under Rule 9(b). County Defendants are in possession of further details regarding these claims and should not be permitted to exploit their refusal to disclose those details in response to Plaintiffs' repeated requests. To the extent Defendants desire further information regarding the witnesses and evidence that Plaintiffs may use to support these claims, they will receive that information under Rule 26 and will be free to conduct appropriate discovery.

### A. Plaintiffs adequately pled their Fourth Claim for *Monell* municipal liability.

Taking the facts alleged in Plaintiffs' FAC as true, Plaintiffs have adequately pled several plausible theories under their Fourth Claim against the County for *Monell* municipal liability.

According to the Ninth Circuit, "[a]t least two routes can lead to" *Monell* liability:

> First, a plaintiff can show that a municipality itself violated someone's rights or that it directed its employee to do so . . . . Alternatively, in limited situations, a plaintiff can demonstrate that a municipality is responsible for a constitutional tort committed by its employee, even though it did not direct the employee to commit the tort.

*Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1185 (9th Cir. 2002) (citations omitted), *overruled on other grounds*, *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016). As in *Gibson*, Plaintiffs "may be able to demonstrate municipal liability under either route." *See id*. at 1186-87.

The Supreme Court in *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163 (1993), settled that § 1983 claims alleging entity liability under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), are not subject to "heightened pleading standards." 507 U.S. at 168; *accord Branch v. Tunnell*, 14 F.3d 449, 450 (9th Cir. 1994). Here, the FAC's allegations provided County Defendants with fair notice of Plaintiffs' claims and set forth facts sufficient to show that several independent *Monell* theories have substantive plausibility. Plaintiffs "were required to do no more to stave off threshold dismissal for want of an adequate statement of their claim." *Johnson v. City of Shelby*, 574 U.S. 10, 135 S. Ct. 346, 346-47 (2014).

### 1. County Defendants' motion ignores one custom and fails to show that the other two could not plausibly cause the violations.

Plaintiffs may establish liability under *Monell* by showing a constitutional violation was caused by a County policy, custom, or practice. *Monell*, 436 U.S. 658. Whereas a policy is a formally adopted rule, statute, or guideline, *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986), customs and practices are more informal in nature, and *Monell* liability may be imposed for a constitutional violation resulting from persistent yet informal conduct of public employees. *Shaw v. Dept. of Alcoholic Beverage Control*, 788 F.2d 600 (9th Cir. 1986) (pattern of police misconduct for discriminatory law enforcement against black bar owners); *Los Angeles Cnty. v. Humphries*, 562 U.S. 29, 36 (2010).

"[A] custom or practice can be supported by evidence of repeated constitutional violations which went uninvestigated and for which the

Case No. 25cv0226 AJB VET
OPPOSITION TO MOTION TO DISMISS FAC

errant municipal officers went unpunished."[3] *Hunter v. Cnty. of Sacramento*, 652 F.3d 1225, 1236 (9th Cir. 2011); *see also Nehad v. Browder*, 929 F.3d 1125, 1141-42 (9th Cir. 2019) (giving examples).

The FAC plausibly alleges that the County had three separate customs and practices that were the moving force of Plaintiffs' harm. *See* Section II.B, *supra*. County Defendants ignore one alleged custom entirely—depriving arrestees suspected of intoxication or mental illness of urgently needed medical care—and for that reason alone, their motion to dismiss this claim necessarily fails.

As for the second alleged County custom—arresting people suspected of acute intoxication with urgent medical needs and booking them into jail without first sending them to a hospital—County Defendants argue that it could not have plausibly caused Kamara's injuries because the FAC does not allege that Kamara was formally booked into jail. Mot. at 7:27-8:4. This contention elevates semantics over substance and ignores context. It is entirely plausible and consistent with the FAC that the deputies intended to book Kamara into jail, and the only reason they did not was that he died in the jail's sallyport during the pre-booking process. Thus, it is also plausible that the deputies acted pursuant to this second custom even though Kamara's death thwarted their objective of booking him.

---

[3] Contrary to County Defendants' argument, the FAC does not assert an independent ratification theory. Rather, it cites past incidents where the County is alleged to have ratified the improper conduct of its employees—for example, by refusing to properly investigate or discipline them, or to remediate other known deficiencies—to plausibly suggest the existence of a custom and practice that caused the instant violations.

Case No. 25cv0226 AJB VET
OPPOSITION TO MOTION TO DISMISS FAC

The third alleged County custom—encouraging deputies to use dangerous restraint methods—also is plausibly alleged to have caused the constitutional violations at issue. County Defendants complain that many of the prior deaths set forth in the FAC involved people who were under the influence, but here, the deputies likewise arrested Kamara on suspicion of being under the influence. FAC ¶ 47. County Defendants argue that the FAC is "silent" about Kamara's cause of death, but the FAC plausibly alleges that his injuries and death were caused by the deputies' use of deadly compressive force and dangerous restraint methods, just like prior deaths. *Id.* ¶¶ 1-2, 51-52, 91, 100, 102.

> **2.     The FAC plausibly alleges that the County's failure to train caused the constitutional violations.**

There are two routes to *Monell* liability under which a failure-to-train theory may succeed. First, it may be based on a deliberate decision to enact affirmative training policies that lead to constitutional violations, in which case it is not necessary to show deliberate indifference. The FAC plausibly alleges this affirmative failure-to-train theory—the County deliberately encouraged deputies to use dangerous restraint methods that restricted breathing, merely to restrain someone or obtain compliance. FAC ¶ 66; Section II.C, *supra*.

Alternatively, liability may attach based on a policy of inaction that reflects deliberate indifference to constitutional rights: "a local governmental body may be liable if it has a policy of inaction and such inaction amounts to a failure to protect constitutional rights." *Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *see also* Ninth Cir. Model Jury Instruction 9.7 (for use where *Monell* liability "is based on a local

-12-

governing body's policy of inaction, such as a failure to train its police officers"). Plaintiffs plausibly allege that the County had such a policy of omission—it did not train to minimize the amount of prone torso compression, or on the "physiology of a struggle." FAC ¶ 67; Section II.C, *supra*. Plaintiffs also alleged a series of prior deaths that placed the County on notice of training deficiencies, making its inaction deliberately indifferent. *Id.* ¶¶ 70, 116-17.

Even without these prior violations, Plaintiffs' allegations here may establish deliberate indifference to the need for more training. The Supreme Court has left open the possibility, "however rare, that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Connick v. Thompson*, 563 U.S. 51 (2011) (citing *City of Canton*, 489 U.S. 378 at 390 n.10). While proving "deliberate indifference" generally requires showing such a pattern, particularly egregious circumstances or an obvious training need based on a single incident may suffice. *Kirkpatrick v. Cnty. of Washoe*, 843 F.3d 784, 794 (9th Cir. 2016) (*en banc*) (holding "a particular 'showing of obviousness can substitute for the pattern of violations ordinarily necessary to establish municipal culpability.'"); *Board of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 410 (1997). "Otherwise, every *Monell* defendant would get one free pass for policies or practices that are substantially certain to violate an individual's constitutional rights." *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 682 (9th Cir. 2021) (cleaned up).

Here, the FAC also supports a plausible inference that this was a recurring scenario, and the training need was so obvious in light of national standards, such that the County's failures amounted to

-13-
OPPOSITION TO MOTION TO DISMISS FAC

deliberate indifference, even without considering the prior deaths. FAC ¶¶ 65-66, 70, 116-17; Section II.C, *supra.*

County Defendants argue that Plaintiffs insufficiently alleged the failure to train caused the use of excessive force, because the FAC does not specifically allege that Kamara died from positional or restraint asphyxia or because of the physiology of a struggle. Mot. at 9:17-28. But those causation theories are plausible, and such a microscopic level of pleading detail is unnecessary.

County Defendants do not point to any allegations in the FAC that make it implausible that Kamara died from asphyxia. Indeed, the FAC alleges that several deputies restrained Kamara on the ground using bodyweight compression, downward pressure, and a WRAP device, restricting his ability to breathe for approximately seven minutes and constituting deadly force, and Kamara's death shortly thereafter was caused by the deputies' unreasonable force and restraint. *Id.* ¶¶ 1, 51, 100. Thus, it is plausible that Kamara died from restraint asphyxia. *E.g., Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1056-57 (9th Cir. 2003); *Aguirre v. City of San Antonio*, 995 F.3d 395, 402 (5th Cir. 2021). Moreover, County Defendants' argument fails for the independent reason that prone restraint can be clearly excessive even when it does not cause death. *See Drummond*, 343 F.3d at 1056-57 (similar force excessive even though it did not result in death); *Spencer v. Pew*, 117 F.4th 1130, 1144 (9th Cir. 2024) (same).

### 3.    County Defendants' motion ignores Plaintiffs' collective inaction *Monell* theory.

A municipality can be liable under § 1983 if "alleged constitutional deprivations were not suffered as a result of actions of the individual officers, but as a result of the collective inaction of the [municipality]."

*Fairley v. Luman*, 281 F.3d 913, 917 (9th Cir. 2002); *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 604 (9th Cir. 2019). County Defendants' motion ignores that Paragraph 118 of the FAC plausibly alleges the County's liability under a collective inaction theory, providing yet another independent reason to deny it on the Fourth Claim.

### B.   The Estate adequately pled its Fifth Claim for violation of the Bane Act.

Plaintiffs contend that a separate "specific intent" element is not required when a Bane Act claim is based on excessive force or indifference to medical needs. However, this Court need not decide that unsettled issue at this juncture, because the FAC plausibly alleges that County Defendants acted with "reckless disregard."

The Bane Act "provides a cause of action for interference . . . 'by threat, intimidation, or coercion' with the 'exercise or enjoyment' of rights under the federal Constitution." *Rodriguez v. County of Los Angeles*, 891 F.3d 776, 799 (9th Cir. 2018) (quoting CAL. CIV. CODE § 52.1(a)-(b)). "[T]he Bane Act does not require 'that the offending threat, intimidation or coercion be independent from the constitutional violation alleged.'" *Rodriguez*, 891 F.3d at 802 (quoting *Cornell v. City and Cnty. of San Francisco* 17 Cal. App. 5th 766, 801-02 (2017)).

Claims asserting unlawful arrest require an additional element of "specific intent," *Cornell*, 17 Cal. App. 5th at 802, but that element is not required for claims of excessive force, *Rodriguez*, 891 F.3d at 802; *Cornell*, 17 Cal. App. 5th at 802 n.31, or deliberate indifference to medical needs, *M.H. v. County of Alameda*, 90 F. Supp. 3d 889, 898 (N.D. Cal. 2013). The FAC plausibly alleges that the deputies' deadly,

compressive force and restraint of Kamara was sufficiently coercive and egregious that "specific intent" is not required.[4]

Even if "specific intent" was required, the FAC plausibly supports such a finding. "Specific intent" does not require that the defendant knew his acts were unlawful; rather, it is satisfied when a defendant acts in reckless disregard of federal rights. *Reese v. Cnty. of Sacramento*, 888 F.3d 1030 (9th Cir. 2018) (quoting *United States v. Reese*, 2 F.3d 870 (9th Cir. 1993)). In *Scott v. Smith*, the Ninth Circuit found under less coercive circumstances that the officers' use of deadly bodyweight force could reflect an even more culpable mental state, deliberate indifference. *Scott v. Smith*, 109 F.4th 1215, 1229 (9th Cir. 2024); *accord Garlick v. Cnty. of Kern*, 167 F. Supp. 3d 1117, 1178-79 (E.D. Cal. 2016) (finding reckless disregard under analogous circumstances).

> Here, the FAC alleges that Aguilera and Phillips acted with reckless disregard to Abdul's rights and safety because they knew he required a medical evaluation and Abdul did not pose a risk or threat to the officers or the public – Abdul was polite, compliant, and cooperative at the Valero gas station when the officers decided *not* to return Abdul to the hospital.

FAC ¶ 86. Then, the Defendant-Deputies restrained Kamara on the ground using bodyweight compression, downward pressure, and a WRAP device, restricting his ability to breathe for approximately seven minutes and constituting deadly force. *Id.* ¶¶ 1, 51, 100. Doe 1, the WRAP safety officer, "did nothing in response to Abdul's complaints of injury and

---

[4] The *Cornell* court noted that its interpretation was "consistent with the view taken by the majority of federal district courts in California which . . . have held various kinds of low- to mid-level force may meet the coercion element of Section 52.1." *Cornell*, 17 Cal. App. 5th at 802 n.31 (citations omitted).

pain." *Id.* ¶ 87. After the WRAP was applied, County Defendants left Kamara unmonitored in a dangerous prone position that restricted his breathing for 20 minutes, contrary to proper training to use a position such as sitting upright that does not restrict breathing and monitoring, and to closely monitor him for signs of distress. *Id.* ¶¶ 2-3, 52, 100. Then, once paramedics arrived, they failed to remove the restraints or properly position Kamara until after he was not breathing, unresponsive, and pulseless. *Id.* ¶¶ 3, 53, 88. The FAC alleges that all defendants' conduct was in deliberate or reckless disregard of constitutional rights, and with specific intent and purpose to violate those rights. *Id.* ¶¶ 92, 103, 125.

## C.    Plaintiffs should be allowed to identify Doe Defendants 21-50 through discovery.

County Defendants move to dismiss Does 21-50 based on a district court opinion's statement that a § 1983 plaintiff must separately allege how each Doe Defendant violated his rights with specific facts. Ninth Circuit precedent holds otherwise, and Plaintiffs' allegations against Does 21-50 satisfy the applicable test.

The Ninth Circuit permits the designation of "Doe" defendants in civil rights actions. *E.g.*, *Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir. 1980); *Wakefield v. Thompson*, 177 F.3d 1160, 1163 (9th Cir. 1999). Although the use of Does is generally not favored,

> situations arise, such as the present, where the identity of alleged defendants will not be known prior to the filing of a complaint. In such circumstances, the plaintiff should be given an opportunity through discovery to identify the unknown defendants, unless it is clear that discovery would not uncover the identities, or that the complaint would be dismissed on other grounds.

*Gillespie*, 629 F.2d at 642. *Gillespie* demonstrates that identification of a Doe defendant by describing their employment or status at a law

-17-

enforcement agency can be sufficient. *Gillespie* involved a *pro se* plaintiff who alleged denial of medical care and unsafe conditions while incarcerated. *Id.* at 639. The plaintiff identified Doe defendants as follows: "John Doe Superintendents #1-10" were superintendents of the federal, state, and local jails where plaintiff was held; "John Doe Marshals #11-20" were employees of the U.S. Marshals at cities where plaintiff had been in custody; and "John Doe Guards #21-100" were guards at each of the holding facilities where plaintiff was detained. *Id.* at 639 n.1. The *Gillespie* plaintiff then propounded interrogatories requesting the government identify the Doe defendants. *Id.* at 643. The district court dismissed the complaint without requiring a response to plaintiff's interrogatories. *Id.* The Ninth Circuit reversed and remanded, holding that the "district court abused its discretion in not permitting the discovery sought by the appellant and the court's subsequent dismissal of the complaint was error." *Id.* The court specifically instructed the district court to permit the plaintiff an opportunity to uncover the identities of the "John Doe" defendants and proceed with his claims. *Id.*

Similarly, the Ninth Circuit held in *Wakefield* that the district court erred in dismissing a Doe defendant "simply because Wakefield was not aware of Doe's identity at the time he filed his complaint." 177 F.3d at 1163. The *pro se* prisoner plaintiff alleged that a Doe defendant denied him prescribed medication. *Id.* at 1162. The district court dismissed the Doe defendant because "Doe defendants are not favored in the Ninth Circuit[.]" *Id.* The Ninth Circuit reversed the district court's dismissal, because the plaintiff had stated a viable § 1983 claim against the Doe defendant for deliberate indifference to his serious medical needs. *Id.* at 1165.

-18-

In this case, Plaintiffs included Doe Defendants because the County withheld almost all information in response to public records requests, including all audio and video. FAC ¶¶ 27-28. As a result, Plaintiffs are genuinely ignorant of the identities of all people whose conduct may have violated Kamara's rights and caused his death, and designated these defendants as Does. *Id.* ¶¶ 29, 35.

Does 21-40 are individuals, corporations, or other entities who had contact with Kamara on March 2-3 and whose conduct violated Kamara's rights and caused him injury or harm. *Id.* ¶ 33. Does 21-40 are not alleged to be County agents or employees. Thus, it is unclear why County Defendants seek their dismissal under Rule 12(b)(6), or how they have standing to assert defenses on their behalf.

Does 41 to 50 are supervisors, captains, commanders, and other high-ranking officials at the San Diego County Sheriff's Department, California Highway Patrol, or Vista Fire Department, who were responsible for supervising, disciplining, and training subordinate individual defendants in this case and who were responsible for promulgating and approving all policies and practices in this case. FAC ¶ 34. These Supervisory Defendant Does 41-50 are sued in their individual capacities for their own personal actions or inactions that caused Abdul Kamara constitutional injury or harm. *Id.*

The FAC asserts plausible supervisory liability claims against Does 41-50. A supervisor may be held liable under § 1983

> for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others.

*Starr*, 652 F.3d at 1208. A plaintiff must show the supervisor's conduct was the proximate cause of the injury. *Id.* at 1207.

-19-

The requisite causal connection can be established (1) by setting in motion a series of acts by others, or (2) by knowingly refusing to terminate a series of acts by others, which the supervisor knew or reasonably should have known would cause others to inflict a constitutional injury. *Id.* at 1207-08 (citing *Dubner v. City of San Francisco*, 266 F.3d 959, 968 (9th Cir. 2001)). "The supervisor need not be directly and personally involved in the constitutional deprivation in the same way as the officials who are on the scene inflicting the constitutional injury." *James v. Lee*, 485 F. Supp. 3d 1241, 1252 (S.D. Cal. 2020) (citing *Starr*, 652 F.3d at 1205-07).

Plaintiffs' FAC also alleges that all defendants were "integral participants" in, or failed to intervene in, the constitutional violations set forth throughout the FAC. FAC ¶ 102. Based on the busy nature of the jail's sallyport, and the presence and involvement of at least one other non-County law enforcement officer, Liekkio, it is plausible that the Does at issue "participated in some meaningful way," *see Boyd v. Benton Cnty.*, 374 F.3d 773, 780 (9th Cir. 2004), in the constitutional violations—and County Defendants do not make any factual argument suggesting otherwise. If the FAC had contained only "threadbare recitals of the elements of a cause of action," it would have stated in conclusory fashion that Defendants violated Kamara's rights under color of law. But the FAC goes considerably further and satisfies the plausibility requirement, particularly because County Defendants did not submit any plausible alternative explanation here. *See Starr*, 652 F.3d at 1216 ("Plaintiff's complaint may be dismissed only when defendant's plausible alternative explanation is so convincing that plaintiff's explanation is *im*plausible.").

These Doe Defendants can be identified through discovery. Indeed, the Sheriff's Department's own records should identify them.[5] Moreover, to avail themselves of California's more liberal relation back rule under amended Rule 15(c)(1)(A) and *Butler v. Nat'l Cmty. Renaissance*, 766 F.3d 1191, 1201 (9th Cir. 2014), Plaintiffs must plead the existence of Doe Defendants under California's fictitious name statute, Code of Civil Procedure § 474. *E.g., Audrey G. v. City of Lafayette*, No. 21-CV-03545-WHO, 2022 WL 16528143, at *7 (N.D. Cal. Oct. 28, 2022); *Ibrahim v. Fiat Chrysler Automobiles*, No. CV1910744MWFPLAX, 2020 WL 7862122, at *5 (C.D. Cal. Nov. 19, 2020).

**D.   The motion improperly uses extrinsic evidence.**

County Defendants seek judicial notice of the entire CAD report. Dkt. 22-2. But County Defendants only rely on the CAD log to argue that Defendants Aguilera and Phillips knew that Kamara had "previously voluntarily left the hospital and was not a 5150 hold." Dkt. 22-1 at 2:16-18. This assertion is apparently intended to excuse the conduct of Aguilera and Phillips, who first determined they would take Kamara to the hospital but then changed their minds and decided to take him to the Vista Detention Facility. *Id*. at 2:14-16. But the FAC also alleges that Aguilera and Phillips spoke directly to hospital personnel, who emphasized that Kamara was not able to care for his own safety and had to be returned to the hospital for a medical hold and evaluation. FAC ¶ 42. Thus, these facts contained in the CAD log are disputed and not

---

[5] Since filing the FAC on April 30, 2025, and receiving County Defendants' signed waivers on May 5, 2025, Plaintiffs have continued to diligently attempt to obtain documents and information that might identify County Doe Defendants. Fattahi Decl. ¶ 2. Except for the identification of Doe 1 as Heard, those efforts have yet to bear fruit. *Id*.

subject to judicial notice under Federal Rule of Evidence 201. *See Gomez v. JP Morgan Chase Bank, N.A.*, No. 3:22-CV-01773-JAH-DEB, 2024 WL 2243243, at \*2 (S.D. Cal. Mar. 26, 2024) (citing *Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001)).

The Ninth Circuit has cautioned that "the unscrupulous use of extrinsic documents to resolve competing theories against the complaint risks premature dismissals of plausible claims that may turn out to be valid after discovery," especially where "the defendants possess materials to which the plaintiffs do not yet have access." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). The Court should decline County Defendants' request to consider cherry-picked, multiple-hearsay CAD entries, which follows the County's refusal to produce documents relating to Kamara's detention and its redaction of some of the information on which it now relies.

The CAD report is neither incorporated by reference nor subject to judicial notice. Where a complaint has relied upon a document, or parts thereof, courts can properly consider the whole of the document to be effectively incorporated by reference. *See Branch*, 14 F.3d at 453-54. Documents are incorporated if "the plaintiff's complaint necessarily relies" on them and their "authenticity . . . is not contested." *Lee*, 250 F.3d at 688-89. The complaint must refer "extensively" to a document. *Khoja*, 899 F.3d at 1002. Here, the FAC does not expressly attribute any allegations to the CAD report, let alone necessarily or extensively rely on it. The FAC explicitly mentions CAD reports only to emphasize that the County refused to produce any other documents about Kamara's detention in response to multiple requests. FAC ¶ 28. In other words, County Defendants seek introduction of the CAD report to create a defense, which

-22-

is nothing more than another way of disputing the factual allegations in the complaint, but with a perverse added benefit: unless the district court converts the defendant's motion to dismiss into a motion for summary judgment, the plaintiff receives no opportunity to respond to the defendant's new version of the facts.

*Khoja*, 899 F.3d at 1003. Moreover, the CAD report is not authenticated by a witness with personal knowledge of its accuracy or provenance. Plaintiffs are in no position to confirm the authenticity of this new document or its derivative representations. The 4- and 11-page "Background Event Chronology" reports previously produced by the County differ from the 7-page "CAD Query Event Display" report that Plaintiffs had not received until County Defendants attached it to their motion. The previously produced reports employ a different format and contain numerous redactions—including the phrase "for 5150," on which the motion relies. Fattahi Decl. ¶ 3. The cited portions appear to be transcriptions of radio communications, representing multiple layers of inadmissible hearsay to which no exception applies. FED. R. EVID. 805. The best evidence of those statements would be the recorded radio communications, which the County has yet to produce in response to Plaintiffs' multiple requests. FED. R. EVID. 1002; Fattahi Decl. ¶ 3. Accordingly, the CAD report is not incorporated into the FAC.[6]

For these reasons, the CAD report also is not subject to judicial notice under Rule 201(b)(2) as a matter of public record. Judicial notice is improper when a fact is "subject to reasonable dispute." FED. R. EVID.

_____

[6] Even if the CAD report was incorporated by reference, courts may not "engage in fact-finding in the course of deciding the sufficiency of the Complaint." *Khoja*, 899 F.3d at 1006. Indeed, "it is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint." *Id.*

201(b). Thus, the Ninth Circuit has held that district courts may not take "judicial notice of *disputed* facts stated in public records." *Lee*, 250 F.3d at 690. Here, what information Defendants had about Kamara is "as yet unproved," and it would be error to resolve any conflicts between the CAD report's vague representations and the FAC's allegations and any reasonable inferences therefrom. *Id.*; *Khoja*, 899 F.3d at 1000-01 (abuse of discretion to judicially notice analogous transcript and report).

### D.    Alternatively, Plaintiffs request leave to amend.

If this Court finds that any of Plaintiffs' claims or Doe allegations are deficient, then Plaintiffs request leave to amend. Leave to amend "shall be freely given when justice so requires." FED. R. CIV. P. 15(a) . "This policy is applied with 'extraordinary liberality.'" *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (quoting *Ownes v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708 (9th Cir. 2001)). Indeed, "leave to amend the pleadings is freely given unless the opposing party makes a showing of undue prejudice, or bad faith or dilatory motive on the part of the moving party." *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Nunes v. Ashcroft*, 375 F.3d 805, 808 (9th Cir. 2004) (also considering prejudice to opposing party, futility, and previous amendments).

### V.    Conclusion

For the foregoing reasons, the Court should deny the motion to dismiss. Alternatively, the Court should grant Plaintiffs leave to amend.

DATED:  June 30, 2025              GRACE JUN
                                   LAW OFFICE OF JOHN FATTAHI


                                   By_____/s/ John Fattahi_____
                                      John Fattahi
                                      Attorneys for Plaintiffs

Case No.  25cv0226 AJB VET
                                          OPPOSITION TO MOTION TO DISMISS FAC