UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE ESTATE OF ABDUL KAMARA, et al., <br><br> Plaintiffs, <br><br> v. <br><br> COUNTY OF SAN DIEGO, et al., <br><br> Defendants. | Case No.: 25-cv-0226-AJB-VET <br><br> **ORDER DENYING DEFENDANTS' MOTION TO DISMISS** <br><br> **(Doc. No. 22)** |

Defendants County of San Diego (the "County"), Christopher Aberle, Alejandro Aguilera, Carlos Heard, Derrick Jones, Travis Kaapke, and Tyler Phillips ("Individual Defendants") (collectively, the "County Defendants") move to partially dismiss Plaintiffs' First Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Doc. No. 22.) The County Defendants also move to dismiss DOES 21–50. (*Id.*) Plaintiffs oppose the Motion. (Doc. No. 25.) The County Defendants filed a reply in support of the Motion. (Doc. No. 26.) Based on the reasoning below, the Court **DENIES** the Motion.

## I.　BACKGROUND

On January 30, 2025, Plaintiffs initiated this lawsuit against Defendants for various civil rights violations in connection with the death of Decedent Abdul Kamara

1

("Decedent"). (*See* Doc. No. 1.) Plaintiffs filed the operative First Amended Complaint ("FAC") on April 29, 2025. (Doc. No. 3.)

Plaintiffs allege the following facts in the FAC, which the Court accepts as true for purposes of the subject Motion. *See, e.g.*, *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 704 (9th Cir. 2016) (noting that on a motion to dismiss under Rule 12(b)(6), the court accepts the allegations in the complaint as true and construes them in the light most favorable to the plaintiff). On March 2, 2024, at approximately 9:18 p.m., Carlsbad paramedics responded to a call from a concerned individual regarding a medical emergency at a Carl's Jr. restaurant. (Doc. No. 3 ¶ 38.) Paramedics found Decedent wandering in the parking lot of a nearby Jack in the Box. (*Id.*) When paramedics arrived, Decedent stated he had been "playing a game with his friends tonight" and expressed paranoia about lights and movement. (*Id.*) Paramedics noted that Decedent was "slightly tachycardic and hypertensive with a heart rate of 112 and a blood pressure reading of 181/116." (*Id.*) Decedent requested to go to the hospital for evaluation. (*Id.*) Paramedics transported Decedent to the emergency department at Scripps Memorial Hospital in Encinitas ("Scripps Encinitas"). (*Id.*)

Decedent arrived at Scripps Encinitas shortly after 10:00 p.m. (*Id.* ¶ 39.) A nurse wrote that, according to paramedics, Decedent "believed the lights being shined into his eyes and the pulse oximeter were 'lasers trying to give him a heart attack.'" (*Id.*) The emergency room doctor noted Decedent's "affect was blunt, his speech was tangential, and his thought content was paranoid and delusional." (*Id.*) The doctor noted Decedent was cooperative and that he did not express homicidal or suicidal ideation. (*Id.*) The doctor wrote that Decedent had an "incoherent and non-linear thought process," and the doctor intended to "initiate [a] broad workup to include [a] CT scan of [Decedent's] head to evaluate for any organic cause of his presentation." (*Id.*)

While medical personnel were getting ready to draw blood for lab work, Decedent ran out of the emergency department without a shirt or shoes. (*Id.* ¶ 40.) At 10:56 p.m., the hospital called 911 and requested police assistance. (*Id.* ¶ 41.) The hospital staff member

2

who called 911 informed dispatch that Decedent was at the hospital for "mental help" and that he was paranoid, "incompetent," and "unable to care for himself." (*Id.*)

Sheriff's deputies, Defendants Aguilera and Phillips, responded to the 911 call. (*Id.* ¶ 42.) At approximately 11:13 p.m., Defendants Aguilera and Phillips spoke to a nurse and the emergency room physician at Scripps Memorial. (*Id.*) The doctor indicated that Decedent could not care for his own safety, and Defendants Aguilera and Phillips were instructed to locate and return Decedent to the hospital for a medical hold. (*Id.*)

At 11:45 p.m., the Sheriff's Department received a 911 call from a gas station employee. (*Id.* ¶ 43.) The caller reported that a man (Decedent) was "crawling around the parking lot without a shirt and only wearing hospital socks." (*Id.*) The caller noted that Decedent had a hospital wristband on his arm. (*Id.*) A deputy arrived at the gas station and found Decedent lying on his stomach with his hands behind his back.[1] (*Id.* ¶ 44.) Decedent was "having involuntary muscle spasms and making comments about being tased even though no one was near him." (*Id.*) According to the deputy, Decedent was cooperative and compliant. (*Id.*)

Defendants Aguilera and Phillips arrived at the gas station at 11:55 p.m. (*Id.* ¶ 45.) Upon arriving at the gas station, Defendants Aguilera and Phillips determined that Decedent was the same individual from Scripps Encinitas. (*Id.*) Defendant Phillips handcuffed Decedent without issue and walked Decedent to the patrol car. (*Id.* ¶ 46.) At midnight, Defendants Aguilera and Phillips informed police dispatch that they were taking Decedent back to Scripps Encinitas. (*Id.*) At 12:22 a.m., Defendants Aguilera and Phillips changed course and told police dispatch that they would be transporting Decedent to the Vista Detention Facility and not to Scripps Encinitas. (*Id.* ¶ 48.)

Upon arriving at the Vista Detention Facility, Defendants Aguilera and Phillips exited the patrol car and Decedent began exhibiting bizarre behavior. (*Id.* ¶ 49.) Decedent

---

[1] It is unclear from the FAC which deputy first arrived on the scene. (*See* Doc. No. 3 ¶¶ 44–45.)

appeared paranoid and agitated and began bouncing around in the back seat of the patrol car. (*Id.*) Decedent hit his head on the patrol car's plexiglass divider causing Decedent to cut his head. (*Id*.) Eventually, Decedent calmed down and Defendant Aguilera moved Decedent from the patrol car to a bench. (*Id.* ¶ 50.) Defendant Aguilera walked away to speak with detention facility deputies while Defendant Phillips waited at the bench with Decedent. (*Id.*)

At approximately 12:49 a.m., Decedent began to stand up from the bench. (*Id.* ¶ 51.) However, Decedent soon ended up on the ground—either by falling or by being taken to the ground by Defendant Phillips. (*Id.*) At this point, Defendants Deputy Sheriff Kaapke, Deputy Sheriff Jones, and California Highway Patrol Officer Liekkio approached the scene. (*Id.* ¶¶ 20, 21, 51.) Defendants Kaapke, Jones, Liekkio, Aguilera, and Phillips laid on top of Decedent, restraining his arms, legs, and neck, and placed a WRAP restraining device around Decedent.[2] (*Id.* ¶ 51.) While Defendants were restraining Decedent, he hit his head on the ground. (*Id.*) Defendants completed placing the WRAP device on Decedent at around 12:56 a.m., at which point he was placed face down in a prone position. (*Id.* ¶¶ 51, 52.) Once Decedent was restrained, Defendants called paramedics, who arrived at approximately 1:13 a.m. (*Id.* ¶ 53.) The FAC alleges that "Deputies who are properly trained on the use of hobbling restraints know that restrained individuals should be placed sitting upright or standing to facilitate breathing and monitoring." (*Id.* ¶ 52.) However, Defendants did not do this and instead left Decedent in the prone position. (*Id.*)

About five minutes after the paramedics arrived, while still prone and restrained by the WRAP, Decedent stopped breathing and became unresponsive. (*Id.* ¶ 53.) At 1:28 a.m., paramedics documented that Decedent had no pulse and began administering cardiopulmonary resuscitation ("CPR"). (*Id.*) Decedent was transported to Tri-City Medical Center where he passed away on the morning of March 3, 2024. (*Id.*)

---

[2] The FAC does not define "WRAP," nor does it describe how the device is meant to be used.

25-cv-0226-AJB-VET

Based on these facts, Decedent—by and through his successor in interest, his mother Fredrika Nabbie—asserts claims under 42 U.S.C. § 1983 for (1) deliberate indifference to serious medical needs in violation of the Fourth and Fourteenth Amendments; (2) excessive and unreasonable force in violation of the Fourth Amendment; (3) deprivation of right of association under the Fourteenth Amendment; (4) municipal liability (*Monell*) against the County; (5) and violation of California's Bane Act. (*Id.* ¶¶ 82–127.) The FAC also alleges survival claims for (6) battery and (7) negligence. (*Id.* ¶¶ 128–141.) Fredrika Nabbie brings the eighth claim for wrongful death. (*Id.* ¶¶ 142–145.)

The County Defendants move to dismiss the fourth claim for *Monell* liability arguing Plaintiffs fail to allege facts sufficient to state a claim under either a policy, ratification, or failure to train theory. (Doc. No. 22-1 at 11.[3]) The County Defendants seek dismissal of the fifth claim under the Bane Act arguing the FAC lacks any facts to establish the necessary "specific intent" of the County Defendants to violate Plaintiff's constitutional rights. (*Id.* at 16.) Finally, the County Defendants contend the allegations against Does 21–50 should be dismissed because Plaintiffs do not allege specific facts showing how each particular Doe Defendant violated Plaintiffs' rights. (*Id.*)

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure ("Rule") 12(b)(6) permits dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Rule 12(b)(6) requires the Court to dismiss claims that fail to establish a cognizable legal theory or do not allege sufficient facts to support a cognizable legal theory. *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008) (citation omitted). Under Rule 8(a)(2) a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

---

[3] Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "In sum, for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (quotations omitted).

To survive a Rule 12(b)(6) motion to dismiss, a complaint does not need detailed factual allegations, but it must provide allegations that raise a right to relief above the speculative level. *Twombly*, 550 U.S. at 555. While the plausibility standard is not a probability test, it does require more than a mere possibility the defendant acted unlawfully. *Id.* at 556. "When evaluating a Rule 12(b)(6) motion, the district court must accept all material allegations in the complaint as true, and construe them in the light most favorable to the non-moving party." *Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*, 710 F.3d 946, 956 (9th Cir. 2013) (citation omitted).

## III. JUDICIAL NOTICE AND INCORPORATION BY REFERENCE

As a preliminary matter, the County Defendants ask the Court to take judicial notice of the Computer Aided Dispatch Log Dated March 2, 2024 (the "CAD Log"). (Doc. No. 22-2.) County Defendants contend the CAD Log "is subject to judicial notice because it is quoted in paragraph 41 of Plaintiffs' First Amended Complaint and is therefore incorporated by reference." (Doc. No. 22-2 at 2.) Plaintiffs oppose the request. (Doc. No. 25 at 29.)

Judicial notice and incorporation by reference are separate and distinct. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018) (noting that judicial notice and incorporation by reference both "permit district courts to consider materials

6

outside a complaint, but each does so for different reasons and in different ways"); *see also United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). Judicial notice under Federal Rule of Evidence 201(b) allows a court to "judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Courts may take judicial notice at any stage of a proceeding. Fed. R. Evid. 201(d). However, judicial notice is uncommon during the pleading phase, as "district courts may not consider material outside the pleadings when assessing the sufficiency of a complaint" under Federal Rule of Civil Procedure 12(b)(6). *Khoja*, 899 F.3d at 998 (citing *Lee v. City of Los Angeles*, 250 F.3d 668, 288 (9th Cir. 2001)). Considering information outside the pleading typically converts the Rule 12(b)(6) motion to dismiss for failure to state a claim into a Rule 56 motion for summary judgment, but judicial notice can serve as an exception. *Id.* at 998; *Ritchie*, 342 F.3d at 908.

Incorporation by reference, on the other hand, is a "judicially created doctrine that treats certain documents as though they are part of the complaint itself." *Khoja*, 899 F.3d at 1002. This doctrine allows the court to incorporate documents and other instruments into a complaint "if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *Ritchie*, 342 F.3d at 908. Merely mentioning a document does not constitute extensive reference. *Id.* at 908–09. Incorporation by reference does not convert a Rule 12(b)(6) motion into a motion for summary judgment. *Id.*

The CAD Log is not subject to judicial notice or incorporation by reference. The Court may not take judicial notice of the CAD Log because it cannot be "accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *See* Fed. R. Evid. 201(b). And the single mention of the CAD Log in the FAC (*see* Doc. No. 3 ¶ 41) is far from meeting the standard for incorporation by reference. *See Ritchie*, 342 F.3d at 908–09. Thus, the County Defendants' request for judicial notice is **DENIED** and the Court finds the CAD Log has not been incorporated by reference.

25-cv-0226-AJB-VET

## IV.    DISCUSSION

### A.    *Monell* Claim

The County moves to dismiss the fourth cause of action contending the FAC fails to state facts sufficient to support a *Monell* claim. (Doc. No. 22-1.) The County argues that "the language of the Complaint makes it difficult to decipher exactly what theories Plaintiffs are attempting to proceed on." (Doc. No. 22-1 at 11.) The County further argues that even if one could decipher Plaintiffs' theories of liability, the "allegations fall below the threshold standards of *Monell* liability." (Doc. No. 22-1 at 11.) The Court disagrees.

As the County recognizes, "Plaintiff[s] allege that part of the custom and practice is arresting individuals in need of urgent medical intervention and booking such arrestees into jail rather than first sending them to a hospital for medical treatment and stabilization." (Doc. No. 22-1 at 11 (citing Doc. No. 3 ¶ 114)). And "Plaintiffs also claim that the Sheriff's Office did not train deputies to try to minimize the amount of weight applied to someone's chest or back while in a prone position or the physiology of a struggle." (*Id.* (citing Doc. No. 3 ¶¶ 66, 67)). It is unpersuasive for the County to contend that the FAC is so unintelligible that Plaintiffs' theories of liability cannot be discerned, while simultaneously devoting substantial portions of the Motion to addressing those very theories. Accordingly, the Court turns to whether Plaintiffs have adequately alleged *Monell* liability for a constitutional injury resulting from a policy, custom, practice, or a failure to train.

In the motion to dismiss context, the Ninth Circuit has made clear claims of *Monell* liability must comply with the basic principles set forth in *Twombly* and *Iqbal. AE v. Cnty. of Tulare*, 666 F.3d 631, 637 (9th Cir. 2012); *see, e.g.*, *Alter v. Cnty. of San Diego*, 635 F. Supp. 3d 1048, 1055 (S.D. Cal. 2022). First, a complaint "may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *AE*, 666 F.3d at 637. Second, "the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Id.*

8

### 1.    Policy, Custom, or Practice

Cities, counties and other local government entities are subject to claims under 42 U.S.C. § 1983. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658. While municipalities, their agencies, and their supervisory personnel cannot be held liable under § 1983 on any theory of respondeat superior or vicarious liability, they can, however, be held liable for deprivations of constitutional rights resulting from their formal policies or customs. *Id.* at 691–93. Liability only attaches where the municipality itself causes the constitutional violation through "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Id.* at 694.

To prevail, a plaintiff must allege "(1) [the plaintiff] had a constitutional right of which he was deprived; (2) the municipality had a policy; (3) the policy amounts to deliberate indifference to his constitutional right; and (4) 'the policy is the moving force behind the constitutional violation.'" *Gordon v. Cnty. of Orange*, 6 F.4th 961, 973 (9th Cir. 2021) (citing *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011)). As to a municipality's policy, a "plaintiff must allege either that (1) a particular municipal action itself violates federal law, or directs an employee to do so; or (2) the municipality, through inaction, failed to implement adequate policies or procedures to safeguard its community members' federally protected rights." *Hyun Ju Park v. City and Cnty. of Honolulu*, 952 F.3d 1136, 1141 (9th Cir. 2020) (internal quotation marks and citations omitted). "Absent a formal governmental policy, [a plaintiff] must show a 'longstanding practice or custom which constitutes the standard operating procedure of the local government entity.'" *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (quoting *Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir. 1992)). "The custom must be so 'persistent and widespread' that it constitutes a 'permanent and well settled city policy.'" *Id.* (quoting *Monell*, 436 U.S. at 691).

Plaintiffs must allege the County acted with deliberate indifference which is "a stringent standard of fault, requiring proof that a [municipality] disregarded a known or

9

obvious consequence of [its] action." *Bd. of the Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 410 (1997) ("Claims not involving an allegation that the municipal action itself violated federal law, or directed or authorized the deprivation of federal rights, present much more difficult problems of proof.") (citations omitted); *see also Hyun Ju Park*, 952 F.3d at 1141 ("When, as here, a plaintiff pursues liability based on a failure to act, she must allege that the municipality exhibited deliberate indifference to the violation of her federally protected rights.") (citing *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012)).

A plaintiff alleging deliberate indifference can survive a Rule 12(b)(6) challenge if he or she alleges the municipality has engaged in a pattern of prior, similar violations of federally protected rights of which it had actual or constructive notice. *See Connick v. Thompson*, 563 U.S. 51, 62 (2011) ("A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference . . . ."); *Starr v. Baca*, 652 F.3d 1202, 1216–17 (9th Cir. 2011) (reversing dismissal where plaintiff "specifically allege[s] numerous incidents" of prior, similar incidents of excessive force and the defendant was provided notice of all these incidents); *Bagos v. Vallejo*, No. 2:20-cv-00185-KJM-AC, 2020 WL 6043949, at *5–6 (E.D. Cal. Oct. 13, 2020) ("[p]rior incidents involving lawsuits alone, even those which do not result in a finding or admission of wrongdoing, can be sufficient for *Monell* liability purposes in the face of a motion to dismiss."); *Villa v. Cnty. of San Diego*, Case No.: 20-cv-537-CAB-NLS, 2020 WL 5535384, at *3–4 (S.D. Cal. Sept. 15, 2020) (denying motion to dismiss *Monell* claim of policy and custom and failure to train claim as the plaintiff referenced federal investigations, citizen complaints, and lawsuits against the County that include similar allegations of misconduct).

Here, the FAC provides factual support that frames the existence of a specific custom or practice that was the moving force behind Plaintiffs' alleged injuries. The FAC alleges the Sheriff's Department has a longstanding custom of arresting and booking intoxicated or mentally ill individuals rather than diverting them to hospitals for medical care. (Doc.

10

No. 3 ¶¶ 55, 62). The FAC goes on to allege that the San Diego County Sheriff's Department has a custom and practice of arresting individuals in need of urgent medical intervention and booking such arrestees into jail rather than first sending them to a hospital for medical clearance. (*Id.* ¶ 62.) Plaintiffs contend that deputies frequently arrest and jail individuals exhibiting medical distress for being "under the influence." (*Id.*) And Plaintiffs allege the County was aware of the recurring pattern of preventable deaths caused by failures to obtain emergency medical care. (*Id.*) As to deliberate indifference, Plaintiffs allege that between 2009 and 2020, Defendants have engaged in a pattern of prior similar violations—indeed, Plaintiffs describe the deaths of twenty individuals that passed away from intoxication or untreated medical crises while in police custody. (*Id.* ¶ 62(a)–(t).) According to the FAC, these deaths occurred because deputies refused to obtain emergency hospitalization and instead criminalized medical crises. (*Id.* ¶ 63.) Finally, Plaintiffs allege that County officials failed to take corrective action despite being on notice of the constitutional violations. (*Id.* ¶ 64.)

In its reply, the County argues it can't be liable for depriving arrestees suspected of intoxication or mental illness of urgently needed medical care because, in this case, Defendants eventually called the paramedics. (Doc. No. 26 at 2–3.) The County contends the custom of depriving arrestees of medical care cannot be the moving force behind the alleged constitutional violation in this case because the FAC indicates Defendants obtained medical care for the decedent. (*Id.* at 3.) This argument is unpersuasive. Plaintiffs do not allege Defendants never provide arrestees and detainees medical care. Rather, the allegation is that Defendants have a policy and practice of arresting and jailing individuals in need of medical attention instead of addressing their medical needs first. (*See* Doc. No. 3 ¶ 62.) Accordingly, the mere fact that Defendants eventually summoned medical assistance does not negate Plaintiffs' allegation that the County's policy of delaying necessary care in favor of arrest was the moving force behind the alleged constitutional violations.

11

Construing the allegations in the light most favorable to Plaintiffs, the FAC's allegations support the finding that Defendants engaged in a practice of arresting individuals rather than providing them with necessary medical care—and this practice was widespread, persistent, and known to policymakers. Accordingly, the Court finds that Plaintiffs have alleged sufficient facts to show the County has a custom or practice of arresting individuals in need of urgent medical intervention and booking such arrestees into jail rather than sending them to a hospital for medical treatment and stabilization, the County was on notice of this custom, and the custom was the moving force behind Plaintiffs' alleged injuries.

### 2. Failure to train

The FAC also includes a *Monell* claim based on a failure to train theory. The County Defendants argue this theory is also not viable. (Doc. No. 22-1 at 11.) Plaintiffs claim that the Sheriff's Office did not train deputies to try to minimize the amount of weight applied to someone's chest or back while in a prone position or the physiology of a struggle. (Doc. No. 3 ¶¶ 66, 67, 116, 117.) Plaintiffs also allege the Sheriff's Department was aware its deputies were killing individuals by using excessive and unreasonable restraint methods. (*Id.* ¶68.)

"[A]s to a municipality, 'the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact.'" *Flores v. Cnty. of Los Angeles*, 758 F.3d 1154, 1158 (9th Cir. 2014) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). This means Plaintiffs "'must demonstrate a conscious or deliberate choice on the part of a municipality in order to prevail on a failure to train claim.'" *Id.* (quoting *Price v. Sery*, 513 F.3d 962, 973 (9th Cir. 2008)) (internal quotation marks omitted). Deliberate indifference requires proof that the municipal entity "disregarded a known or obvious consequence" that a particular omission in its training program would cause city employees to violate citizens' constitutional rights. *See Brown*, 520 U.S. at 410. "Thus, when [the municipal entity is] on actual or constructive notice that a particular omission in their

12

training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose[s] to retain that program." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (citing *Brown*, 520 U.S. at 407). In the failure to train context, additional instances of misconduct are usually required to show deliberate indifference, however, a narrow range of possibilities exist where the need for training is so "obvious" as to be satisfied by a single incident. *Connick*, 563 U.S. at 64.

"To allege a failure to train, a plaintiff must include sufficient facts to support a reasonable inference (1) of a constitutional violation; (2) of a municipal training policy that amounts to a deliberate indifference to constitutional rights; and (3) that the constitutional injury would not have resulted if the municipality properly trained their employees." *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1153-54 (9th Cir. 2021) (citing *Blankenhorn v. City of Orange*, 485 F.3d 463, 484 (9th Cir. 2007)).

Here, the FAC alleges the Sheriff's Department did not train deputies to minimize the amount of weight applied to someone's chest or back while in a prone position; instead, it trained them that they may have to apply additional body weight. (Doc. No. 3 ¶ 66). The Department failed to train on the "physiology of a struggle" or risks of positional asphyxia (*Id.* ¶ 67). The FAC alleges numerous prior deaths which involved prone restraint and/or the use of hobbling restraints, WRAP devices, spit socks, and carotid holds (*Id.* ¶ 68(a)–(i)). Plaintiffs allege the Sheriff's Department refused to correct known training and policy deficiencies despite jury verdicts and public findings. (*Id.* ¶ 69.) The FAC alleges these prior incidents placed the Sheriff's Department on notice of unconstitutional training related to restraint practices, yet no remedial action was taken. (*Id.* ¶¶ 69–70.) These allegations are sufficient to state a claim for failure-to-train.

Accordingly, the Court finds Plaintiffs have sufficiently alleged *Monell* liability against the County for a constitutional injury resulting from a custom, practice, policy, or a failure to train. The Motion to Dismiss the *Monell* claim against the County is **DENIED**.

25-cv-0226-AJB-VET

## B.     Bane Act

Defendants move to dismiss Plaintiffs' Bane Act claim arguing "the FAC lacks any facts to establish the necessary 'specific intent' of the County Defendants to violate Plaintiffs' constitutional rights." (Doc. No. 22-1 at 16.) Plaintiffs counter that the FAC plausibly alleges that County Defendants acted with "reckless disregard." (Doc. No. 25 at 22.) According to Plaintiffs, "the deputies' deadly, compressive force and restraint of [Decedent] was sufficiently coercive and egregious that 'specific intent' is not required." (Doc. No. 25 at 23.) Plaintiffs go on to argue that even if "specific intent" was required, the FAC plausibly supports such a finding. The Court finds Plaintiffs arguments meritorious.

The Tom Bane Civil Rights Act was enacted in 1987 to address hate crimes. *Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1040 (9th Cir. 2018); *see* Cal. Civ. Code § 52.1. The Bane Act "protects individuals from conduct aimed at interfering with rights that are secured by federal or state law, where the interference is carried out 'by threats, intimidation or coercion.'" *Reese*, 888 F.3d at 1040 (quoting *Venegas v. Cnty. of Los Angeles*, 153 Cal. App. 4th 1230, 1239 (2007)). Violations of federal and California constitutional and statutory rights are all cognizable under the Bane Act. *See* Cal. Civ. Code § 52.1(b) (a violation occurs when a defendant "interfere[s] . . . with the exercise or enjoyment . . . of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state"). Claims under the Bane Act may be brought against public officials who are alleged to interfere with protected rights, and qualified immunity is not available for those claims. *See Venegas*, 153 Cal. App. 4th at 1246.

The Ninth Circuit has held "the Bane Act does not require the 'threat, intimidation[,] or coercion' element of the claim to be transactionally independent from the constitutional violation alleged" so long as the claimant shows the defendant had a "specific intent" to commit the constitutional violation. *Reeseo*, 888 F.3d at 1043 (9th Cir. 2018). The specific intent requirement "is satisfied where the defendant allegedly acted with '[r]eckless

14

disregard of the right at issue.'" *Estate of Serna v. Cnty. of San Diego*, No. 20-cv-2096-LAB, 2022 WL 827123, at *8 (S.D. Cal. Mar. 18, 2022) (quoting *Cornell v. City & Cnty. of San Francisco*, 17 Cal. App. 5th 766, 804) (alteration in original); *see, e.g.*, *M.H. v. Cnty. of Alameda*, 90 F. Supp. 3d 889, 898 (N.D. Cal. 2013) (treating deliberate indifference as intentional conduct); *see also Scalia v. Cnty. of Kern*, 308 F. Supp. 3d 1064, 1084 (treating deliberate indifference as a coercive act).

Here, the FAC sufficiently alleges a Bane Act claim against the County Defendants. First, the right at issue, "the right to be free from deliberate indifference to one's serious medical needs, is 'clearly delineated and plainly applicable' to the circumstances." *Scalia*, 308 F. Supp. 3d at 1084 (E.D. Cal. 2018) (quoting *Cornell*, 17 Cal. App. 5th at 803). As is the right to be free from the use of excessive force. *Graham v. Connor*, 490 U.S. 386 (1989); *Brown*, 520 U.S. at 414. Second, the FAC alleges that Defendants Aguilera and Phillips acted with reckless disregard for Decedent's rights and safety because they knew he required medical attention, did not pose a risk or threat to the officers or the public, and ultimately decided to take Decedent to Vista Detention Facility rather than returning him to the hospital. (Doc. No. 3 ¶ 86.) Then, the Individual Defendants restrained Decedent on the ground using bodyweight compression, downward pressure, and a WRAP device, restricting his ability to breathe for approximately seven minutes and constituting deadly force. (*Id.* ¶¶ 1, 51, 100.) Doe 1, the WRAP safety officer, "did nothing in response to [Decedent's] complaints of injury and pain." (*Id.* ¶ 87.) After the WRAP was applied, Individual Defendants left Decedent unmonitored in a dangerous prone position that restricted his breathing for 20 minutes, contrary to proper training to use a position such as sitting upright that does not restrict breathing and monitoring, and to closely monitor him for signs of distress. (*Id.* ¶¶ 2–3, 52, 100.) Then, once paramedics arrived, they failed to remove the restraints or properly position Decedent until after he was not breathing, unresponsive, and pulseless. (*Id.* ¶¶ 3, 53, 88.) The FAC alleges that all Defendants' conduct was in deliberate or reckless disregard of constitutional rights, and with specific intent and purpose to violate those rights. (*Id.* ¶¶ 92, 103, 125.) Taken together, these

25-cv-0226-AJB-VET

allegations plausibly establish that Defendants interfered with Decedent's clearly established rights through threats, intimidation, or coercion, thereby sufficiently stating a claim under the Bane Act.

Accordingly, the Court rejects Defendants' argument that Plaintiffs here have failed adequately to allege a violation of the Bane Act. The Court **DENIES** Defendants' Motion to Dismiss Plaintiffs' Bane Act claim.

## C.    DOE DEFENDANTS 21-50

Finally, the County Defendants move to dismiss Doe Defendants 21–50. (Doc. No. 22-1 at 16–17.) The FAC identifies Doe Defendants 21 to 40 as "individuals, corporations, or other entities in the County of San Diego who had contact with [Decedent] on March 2, 2024, or March 3, 2024, and whose actions, or inactions, violated [Decedent's] state and federally protected rights and whose conduct caused decedent injury or harm." (Doc. No. 3 ¶ 33.) Doe Defendants 41 to 50 are identified as "supervisors, captains, commanders, and other high-ranking officials at the San Diego County Sheriff's Department, California Highway Patrol, or Vista Fire Department, who were responsible for supervising, disciplining, and training subordinate individual defendants in this case and who were responsible for promulgating and approving all policies and practices in this case." (*Id.* ¶ 34.)

"As a general rule, the use of 'John Doe' to identify a defendant is not favored." *Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir. 1980). However, "where the identity of alleged defendants will not be known prior to the filing of a complaint . . . [a] plaintiff should be given an opportunity through discovery to identify the unknown defendants, unless it is clear that discovery would not uncover the identities, or that the complaint would be dismissed on other grounds." *Id.* Plaintiff must nevertheless still "allege specific facts showing how each particular doe defendant violated his rights." *Keavney v. Cnty. of San Diego*, No. 3:19-cv-01947-AJB-BGS, 2020 WL 4192286, at *4 (S.D. Cal. July 20, 2020).

25-cv-0226-AJB-VET

Dismissal of Plaintiffs' claims against the Doe Defendants is premature at this point. The Court declines to dismiss the claims against the Doe Defendants simply because Plaintiffs were not aware of their identities at the time they filed the Complaint. *See Wakefield v. Thompson*, 177 F.3d 1160, 1163. Indeed, dismissal would only be warranted if (1) discovery would not uncover their identities or (2) dismissal is warranted on other grounds. *See id.* (quoting *Gillespie*, 629 F.2d at 642); *see also Palacios v. Cnty. of San Diego*, No. 20-cv-450-MMA (DEB), 2020 WL 4201686, at *4 (S.D. Cal. July 22, 2020).

Here, Plaintiffs allege the County withheld information in response to public records requests, including all audio and video of the incident. (Doc. No. 3 ¶¶ 27–28.) As a result, Plaintiffs allege they "are genuinely ignorant of the identities of all people whose conduct may have violated [Decedent's] rights and caused his death." (*Id.* ¶¶ 29, 35.) The Court finds that discovery could uncover the Doe Defendants' identities. Assuming the truth of Plaintiffs' well-pleaded allegations and construing them in their favor, *Chubb Custom*, 710 F.3d at 956, the Court finds that is plausible that the Doe Defendants are: (1) individuals, corporations, or other entities in the County of San Diego who had contact with Decedent (Does 21–40); and (2) supervisors, captains, commanders, and other high-ranking officials at the San Diego County Sheriff's Department, California Highway Patrol, or Vista Fire Department, who were responsible for supervising, disciplining, and training subordinate individual defendants in this case (Does 41–50). Accordingly, the County Defendants' Motion to Dismiss Doe Defendants 21–50 is **DENIED**.

## V.   CONCLUSION

For the foregoing reasons, the Court **DENIES** the County Defendants' Motion to Dismiss. The County Defendants must answer the FAC on or before **April 1, 2026**.

**IT IS SO ORDERED.**

Dated:  March 17, 2026

_____
Hon. Anthony J. Battaglia
United States District Judge

17

25-cv-0226-AJB-VET