Grace Jun (SBN 287973)
grace@gracejunlaw.com
501 West Broadway, Suite 1480
San Diego, CA 92101
Tel: (310) 709-4012

LAW OFFICE OF JOHN FATTAHI
John Fattahi (SBN 247625)
jfattahi@gmail.com
21250 Hawthorne Blvd, Suite 500
Torrance, CA 90503
Tel: (424) 999-5579

LAW OFFICES OF DALE K. GALIPO
Dale K. Galipo (SBN 144074)
dalekgalipo@yahoo.com
Cooper Alison-Mayne (SBN 343169)
cmayne@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, CA 91367
Phone: (818) 347-3333

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

THE ESTATE OF ABDUL KAMARA by and through its successor in interest FREDRIKA NABBIE, and FREDRIKA NABBIE, in her own right,

Plaintiffs,

v.

COUNTY OF SAN DIEGO; ALEJANDRO AGUILERA, in his individual capacity; TYLER PHILLIPS, in his individual capacity; CHRISTOPHER ABERLE, in his individual capacity; CARLOS HEARD, in his individual capacity; TRAVIS KAAPKE, in his individual capacity; DERRICK JONES, in his individual capacity; SAMUEL PEREZ, in his individual capacity; LISA FLORA, in her individual capacity; KLAYTON LIEKKIO, in

Case No. 25CV0226 AJB VET

**SECOND AMENDED COMPLAINT**

1) **Objectively Unreasonable Deprivation of Medical Care (42 U.S.C. § 1983)**
2) **Excessive Force (42 U.S.C. § 1983)**
3) **Deprivation of Right of Association (42 U.S.C. § 1983)**
4) ***Monell* Municipal Liability (42 U.S.C. § 1983)**
5) **Violation of California's Bane Act (Civil Code § 52.1)**
6) **Battery**
7) **Negligence**
8) **Wrongful Death**

**JURY TRIAL DEMANDED**

his individual capacity; CITY OF VISTA; SHANE APPLEGATE, in his individual capacity; VINCENT COREY, in his individual capacity; JACOB HAPROFF, in his individual capacity; BRYON LAMORANDIER, in his individual capacity; and DOES 4-10 and 15-50,

Defendants.

# TABLE OF CONTENTS


I. INTRODUCTION ........................................ 1

II. JURISDICTIONAL ALLEGATIONS ........................................ 3

III. PARTIES ........................................ 4

IV. FACTUAL ALLEGATIONS REGARDING THE DEATH OF ABDUL KAMARA COMMON TO ALL CLAIMS OF RELIEF ........................................ 9

V. *MONELL* MUNICIPAL LIABILITY ALLEGATIONS ........................................ 13

A. The San Diego County Sheriff's Department Has a Custom and Practice of Depriving Arrestees Suspected of Intoxication and Mental Illness of Urgently Needed Medical Care. ........................................ 14

B. The San Diego County Sheriff's Department Failed to Properly Train, Supervise, and Discipline Deputies Who Used Unreasonable Force and Improper Restraint Methods. ........................................ 22

VI. CAUSES OF ACTION ........................................ 28

A. FIRST CAUSE OF ACTION – 42 U.S.C. § 1983 ........................................ 28

B. SECOND CAUSE OF ACTION - 42 U.S.C. § 1983 ........................................ 31

C. THIRD CAUSE OF ACTION – 42 U.S.C. § 1983 ........................................ 33

D. FOURTH CAUSE OF ACTION – *MONELL* ........................................ 34

E. FIFTH CAUSE OF ACTION – BANE ACT ........................................ 36

F. SIXTH CAUSE OF ACTION – BATTERY ........................................ 38

G. SEVENTH CAUSE OF ACTION – NEGLIGENCE ........................................ 39

H. EIGHTH CAUSE OF ACTION – WRONGFUL DEATH ........................................ 41

VII. PUNITIVE DAMAGES ........................................ 42

VIII. PRAYER FOR RELIEF ........................................ 42

IX. JURY TRIAL DEMAND ........................................ 42

COMES NOW Plaintiffs THE ESTATE OF ABDUL KAMARA, by and through its successor in interest FREDRIKA NABBIE, and FREDRIKA NABBIE, in her own right, by and through their attorneys of record, to allege and complain as follows:

# I. INTRODUCTION

1. On March 3, 2024, in the sallyport of the Vista Detention Facility, Abdul Kamara lost his life while in the custody of law enforcement officers who had been called to help him obtain urgently needed medical care. For approximately five minutes, six officers placed their bodyweight and downward force on Abdul who weighed only 136 lbs and was 5 ft, 6 inches tall. Abdul had been compliant and cooperative with officers' commands before the use of force. He was handcuffed and sitting on a bench. The officers' use of force was precipitated by a fall – Abdul either fell over or was taken down. This led six officers to use compressional force to restrain Abdul who was eventually placed in a WRAP restraint device and left prone on the ground.

2. Although nurses and doctors work at the Vista Detention Facility, none of the deputies asked for Abdul to be medically assessed or evaluated. No one rendered aid to Abdul who remained in the WRAP restraint. His head had been injured so badly that Abdul suffered a subarachnoid hemorrhage. Although Abdul should have been placed and maintained in the recovery position, seated upright or placed in a standing position, and closely monitored for signs of distress, officers left him laying prone on the ground.

3. Approximately 20 minutes passed without medical care for Abdul Kamara. When Vista Fire Department paramedics arrived, Abdul was dangerously hypotensive and had a weak pulse. But none of the Defendants loosened or removed any portion of the WRAP restraint. Thereafter, Abdul was found to be not breathing and unresponsive. A pulse could not be detected. Finally, Defendants removed Abdul's handcuffs, removed the top portion of the WRAP restraint, and

moved him out of the prone position. Paramedics began CPR and transported him to the hospital. But it was too late – Abdul Kamara died on March 3, 2024. He was 29 years old.

4. Abdul should have never been taken to the Vista Detention Facility in the first instance. A few hours before, Abdul had sought emergency medical care for himself. Carlsbad paramedics transported Abdul to Scripps Memorial Hospital in Encinitas due to concerns about his health and mental well-being. Abdul eloped from the emergency room at Scripps Hospital. Hospital staff called 911 to request assistance locating Abdul as they were concerned for his safety and condition. Scripps Hospital personnel told Defendant-officers Alejandro Aguilera and Tyler Phillips to return Abdul to the hospital for a medical hold and evaluation when they found Abdul. Medical staff told Aguilera and Phillips that Abdul was paranoid, delusional, and unable to care for his own safety.

5. Less than one hour later, Defendants Aguilera and Phillips encountered Abdul at a Valero gas station in Cardiff, which was about one mile away from Scripps Hospital. Abdul was crawling on the ground of the parking lot without shirt and shoes while wearing a hospital wristband. He was making nonsensical statements. Aguilera and Phillips knew Abdul was the patient who had eloped from the Scripps hospital emergency room. They knew Abdul was not able to care for himself or make sound decisions regarding his serious medical needs. They knew the ER physician and nurses wanted Abdul returned to the hospital for a medical hold because he needed to be evaluated. But instead of returning Abdul to the hospital for medical assessment, diagnosis, and treatment, as they had been instructed to do by a doctor, deputies decided to arrest Abdul for being "under the influence," a misdemeanor, and book him into the Vista Detention Facility. Instead of receiving the medical care he desperately needed, Abdul died hours later at the jail.

6. Abdul's mother, Fredrika Nabbie, and his stepfather, Gibrilla Turay, had struggled to bring Abdul to the perceived safety of the United States. A vicious civil war in their birth country of Sierra Leone had threatened their lives. Eventually, the family fled the war and legally immigrated to the United States. They brought Abdul to the United States with confidence and faith in security and the rule of law in their adopted country. But now, their eldest son is dead at the hands of state actors in San Diego County whose job was to help him.

## II. JURISDICTIONAL ALLEGATIONS

7. Jurisdiction is proper in the United States District Court for the Southern District of California pursuant to 28 U.S.C. § 1331 and 28 U.S.C. §§ 1343(3) and (4) *et. seq*. This Court has supplemental jurisdiction over Plaintiffs' claims arising under state law pursuant to 28 U.S.C. § 1367(a), because those claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

8. Venue is proper in this Court under 28 U.S.C. § 1391(b) because the acts or omissions which form the basis of Plaintiffs' claims occurred in the Southern District of California.

9. At all times relevant to this complaint, decedent Abdul Kamara was an individual residing in San Diego County, California.

10. At the time of his death, Abdul Kamara was not married. He had no children. He did not leave behind any will or other testamentary document. Abdul Kamara died intestate. For this reason, there is no probate proceeding pending related to Abdul Kamara. As his mother and surviving parent, Fredrika Nabbie is Abdul's heir and beneficiary. No other person has a superior right to commence this action or proceeding, or to be substituted for decedent Abdul Kamara in this pending action. Therefore, Fredrika Nabbie is Abdul Kamara's successor-in-interest. This action on behalf of decedent Abdul Kamara, or the

Estate of Abdul Kamara, is brought by Fredrika Nabbie as decedent's successor-in-interest.

11. Plaintiffs Estate of Abdul Kamara and Fredrika Nabbie have both properly complied with the California Tort Claims Act. Their separate claims were submitted to the County of San Diego on May 3, 2024. The County of San Diego denied the claim for the Estate of Abdul Kamara and the claim for Fredrika Nabbie on July 31, 2024.

12. Plaintiffs Estate of Abdul Kamara's and Fredrika Nabbie's claims were submitted to the City of Vista on February 12, 2025, and deemed denied with "no action taken" on February 21, 2025. Plaintiffs Estate of Abdul Kamara's and Fredrika Nabbie's claims were submitted to the State of California on February 12, 2025. The State of California denied Ms. Nabbie's claim on March 26, 2025. It denied the Estate of Abdul Kamara's claim on March 27, 2025. Facts regarding delayed discovery and the accrual of the claims as to the City of Vista and its employees and the State of California and its employees are set forth in the following sections. *See infra.*

## III. PARTIES

13. Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same by reference as if fully set forth herein.

14. Defendant COUNTY OF SAN DIEGO is a public entity, duly organized and existing under the law of the State of California. The San Diego County Sheriff's Department is an agency operating under the County of San Diego's authority. The Sheriff's Department is, and was at all relevant times mentioned herein, responsible for the actions and/or inactions and the policies, procedures, practices/customs of its employees, contractors and/or agents.

15. Defendant CITY OF VISTA is a public entity, duly organized and existing under the law of the State of California. The Vista Fire Department is an agency operating under the City of Vista's authority. The Vista Fire Department

is, and was at all relevant times mentioned herein, responsible for the actions and/or inactions and the policies, procedures, practices/customs of its employees, contractors and/or agents.

16. At all times relevant to this complaint, Defendant ALEJANDRO AGUILERA was a deputy sheriff employed by the San Diego County Sheriff's Department and assigned to work at the North County Coastal Patrol division.

17. At all times relevant to this complaint, Defendant TYLER PHILLIPS was a deputy sheriff employed by the San Diego County Sheriff's Department and assigned to work at the North County Coastal Patrol division.

18. At all times relevant to this complaint, Defendant CHRISTOPHER ABERLE was a deputy sheriff employed by the San Diego County Sheriff's Department and assigned to work at the Vista Detention Facility.

19. At all times relevant to this complaint, Defendant CARLOS HEARD was a deputy sheriff employed by the San Diego County Sheriff's Department and assigned to work at the Vista Patrol division.

20. At all times relevant to this complaint, Defendant TRAVIS KAAPKE was a deputy sheriff employed by the San Diego County Sheriff's Department and assigned to work at the Vista Patrol division.

21. At all times relevant to this complaint, Defendant DERRICK JONES was a deputy sheriff employed by the San Diego County Sheriff's Department.

22. At all times relevant to this complaint, Defendant SAMUEL PEREZ was a deputy sheriff employed by the San Diego County Sheriff's Department.

23. At all times relevant to this complaint, Defendant LISA FLORA was a deputy sheriff employed by the San Diego County Sheriff's Department.

24. At all times relevant to this complaint, Defendant KLAYTON LIEKKIO was a patrol officer employed by the California Highway Patrol.

25. At all times relevant to this complaint, Defendant SHANE APPLEGATE was a firefighter-paramedic employed by the Vista Fire Department.

26. At all times relevant to this complaint, Defendant VINCENT COREY was a firefighter-paramedic employed by the Vista Fire Department.

27. At all times relevant to this complaint, Defendant JACOB HAPROFF was a firefighter-paramedic employed by the Vista Fire Department.

28. At all times relevant to this complaint, Defendant BRYON LAMORANDIER was a fire engineer employed by the Vista Fire Department.

29. After Abdul Kamara's death, Fredrika Nabbie issued multiple California Public Records Act requests to the Sheriff's Department for all records related to the arrest and death of Abdul Kamara, including any reports, audio recordings, and video recordings. California's Assembly Bill No. 748 ("AB 748") requires disclosure of all video and audio recordings of "critical incidents" within 45 days of the date of the incident. A "critical incident" is defined as any "incident in which the use of force by a peace officer or custodial officer against a person resulted in death or in great bodily injury." (Cal. Gov. Code § 6254(f)(4)(C)). Moreover, California Senate Bill No. 1421 ("SB 1421") requires disclosure of investigative records and reports of incidents in which a peace officer or custodial officer used force resulting in death or great bodily injury. *See* Cal. Pen. Code § 832.7(b). Despite these California laws, the Sheriff's Department has refused to produce audio, video, and investigative records related to Abdul Kamara's death.

30. On December 2, 2024, the San Diego County District Attorney's Office declined to pursue any criminal charges against the officers involved in the death of Abdul Kamara. After the District Attorney declined to pursue criminal charges, Plaintiffs submitted renewed Public Records requests to both the San Diego County Sheriff's Department and the San Diego Police Department for all

audio, video, reports, and other records related to the death of Abdul Kamara. SDPD conducted the homicide investigation of Mr. Kamara's death. Both the Sheriff's Department and SDPD rejected Plaintiffs' requests and refused to produce any audio, video, or other investigative evidence related to Abdul's death. The San Diego County Sheriff's Department only released two computer-aided dispatch (CAD) logs, or CAD reports.

31. Because the law enforcement agencies with custody and control of all evidence and information regarding Abdul's death refuse to release that information to Plaintiffs, Plaintiffs are genuinely ignorant of the identities of all people who had contact with Abdul Kamara and whose actions or inactions may have violated Abdul's constitutional rights and caused his death. Plaintiffs do not know and cannot ascertain the factual basis for claims against these unknown identities. For these reasons, Plaintiffs have designated these defendants as DOES 1-10 and 15-50.

32. At all times relevant to this complaint, Defendant HEARD was a law enforcement officer at the Vista Detention Facility sallyport who was present when Abdul Kamara was being restrained. HEARD was designated as the WRAP Safety Officer and it was his responsibility, along with others, to ensure that the WRAP was correctly applied and that Abdul was breathing, conscious, and not in medical distress during the restraint process.

33. At all times relevant to this complaint, Defendant DOES 4 to 10 were San Diego County Sheriff's Department agents and employees who had contact with Abdul Kamara on March 2, 2024, and March 3, 2024, and whose actions, or inactions, violated Abdul Kamara's constitutional rights and who caused decedent injury or harm.

34. At all times relevant to this complaint, Defendants DOES 15 to 20 were agents and employees of the Vista Fire Department and/or City of Vista who had contact with Abdul Kamara on March 2, 2024, or March 3, 2024, and whose

actions, or inactions, violated Abdul Kamara's constitutional rights and who caused decedent injury or harm.

35. At all times relevant to this complaint, Defendants DOES 21 to 40 were individuals, corporations, or other entities in the County of San Diego who had contact with Abdul Kamara on March 2, 2024, or March 3, 2024, and whose actions, or inactions, violated Abdul Kamara's state and federally protected rights and whose conduct caused decedent injury or harm.

36. At all times relevant to this complaint, Defendants DOES 41 to 50 were supervisors, captains, commanders, and other high-ranking officials at the San Diego County Sheriff's Department, California Highway Patrol, or Vista Fire Department, who were responsible for supervising, disciplining, and training subordinate individual defendants in this case and who were responsible for promulgating and approving all policies and practices in this case. These Supervisory Defendant DOES 41-50 are sued in their individual capacities for their own personal actions or inactions that caused Abdul Kamara constitutional injury or harm.

37. Because of the limited information provided by the Sheriff's Department in response to public records requests, and the refusal of the Sheriff's Department and SDPD to provide any audio or video regarding Abdul's death before the filing of this Complaint, Plaintiffs are truly ignorant of the true names and capacities of Does 4 through 10 and 15 through 50, inclusive, and/or are truly ignorant of the facts giving rise to their liability. Because the true names and capacities, whether individual, corporate, entity, or otherwise, of DOES 4-10 and 15-50 are unknown to Plaintiffs, Plaintiffs sue these Defendants by their fictitious names. Plaintiffs will amend this complaint once DOES' identities have been ascertained, as well as the facts giving rise to their liability, to show the true names and capacity of each of these Defendant DOES 4-10 and 15-50. Each of

Defendant DOES 4-10 and 15-50 are responsible in some manner for the conduct or liabilities alleged herein.

38. All Defendants were agents, servants and employees of each other and/or of the other named defendants and were acting at all times under color of law and within the full course and scope of their agency and employment, with the full knowledge and consent, either express or implied, of their principal and/or employer, and/or of each of the other named defendants. Each of the defendants approved or ratified the actions of the other defendants, thereby making the currently named defendants herein liable for the acts and/or omissions of their agents, servants, and/or employees.

## IV. FACTUAL ALLEGATIONS REGARDING THE DEATH OF ABDUL KAMARA COMMON TO ALL CLAIMS OF RELIEF

39. Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same by reference as if fully set forth herein.

40. On March 2, 2024, at approximately 9:18 pm, Carlsbad paramedics responded to a call from a concerned individual regarding a medical emergency at a Carl's Jr restaurant on Carlsbad Village Drive. Paramedics found Abdul Kamara wandering in the parking lot of a nearby Jack in the Box. Abdul stated he had been "playing a game with his friends tonight" and expressed paranoia about lights and movement. Abdul was noted to be slightly tachycardic and hypertensive with a heart rate of 112 and a blood pressure reading of 181/116. He requested to go to the hospital for evaluation. Paramedics transported Abdul to the emergency department at Scripps Memorial Hospital in Encinitas ("Scripps Encinitas").

41. Abdul arrived at Scripps Encinitas shortly after 10:00 pm. A nurse wrote that, according to paramedics, Abdul believed the lights being shined into his eyes and the pulse oximeter were "lasers trying to give him a heart attack." The ER doctor noted Abdul's affect was blunt, his speech was tangential, and his

thought content was paranoid and delusional. Abdul's cognition and judgment were impaired. The doctor noted Abdul was cooperative and that Abdul did not express homicidal or suicidal ideation. The ER doctor wrote Abdul had "incoherent and non-linear thought process." He intended to "initiate broad workup to include CT scan of [Abdul's] head to evaluate for any organic cause of his presentation."

42. While medical personnel were getting ready to draw blood from Abdul for lab work, Abdul eloped from the hospital and ran out of the emergency department without shirt or shoes.

43. At 10:56 pm, the hospital called 911 to request the assistance of police. The hospital staff member who called 911 informed dispatch that Abdul was at the hospital for "mental help" and that he was paranoid, "incompetent" and "unable to care for himself."

44. Sheriff's deputies and defendants AGUILERA and PHILLIPS responded to the call from Scripps Encinitas. At approximately 11:13 pm, they spoke to a nurse and the emergency room physician at the hospital. The ER doctor reiterated to AGUILERA and PHILLIPS that Abdul was not able to care for his own safety. AGUILERA and PHILLIPS were instructed to locate and return Abdul Kamara to the hospital for a medical hold. The deputies were told that Abdul had to be medically evaluated. AGUILERA and PHILLIPS canvassed the area near Scripps Encinitas but were unable to locate Abdul.

45. At 11:45 pm, Sheriff's Department dispatch received a 911 call from an employee at the Valero Gas Station located at 820 Birmingham Drive. The caller reported that a man (Abdul) was crawling around the parking lot without a shirt and only wearing hospital socks. The caller noted Abdul had a hospital wristband on his arm. Abdul made statements like "Help! You have to help hack me! You have to hack me!" The gas station employee stated that Abdul was never aggressive but seemed "off." According to the employee, when he asked Abdul

not to come inside because he was shirtless, Abdul complied and was polite. The employee further stated that Abdul could not walk, and there were no indications at all of any drugs, alcohol, or weapons.

46. Defendant-deputy FLORA arrived at the gas station and found Abdul lying with his stomach on the ground and his hands behind his back. Abdul was having involuntary muscle spasms and making comments about being tased even though no one was near him. According to FLORA, Abdul was cooperative and compliant.

47. Defendants AGUILERA and PHILLIPS arrived at the gas station at 11:55 pm. Abdul continued to yell, “I’m getting tased, I’m getting tased,” although he was not being tased. AGUILERA and PHILLIPS determined that Abdul was the “5150” patient who had eloped from Scripps Encinitas Hospital.

48. PHILLIPS handcuffed Abdul without any issue and patted him down. After handcuffing Abdul, PHILLIPS walked Abdul to the patrol car. According to PHILLIPS, Abdul was cooperative. Abdul used the term “sir” when he addressed the deputies. Abdul complied with the officers’ instructions and directives. PHILLIPS fully searched Abdul. At 12:00 am on March 3, AGUILERA and PHILLIPS informed police dispatch that they would be taking Abdul back to the ER at Scripps Encinitas hospital.

49. Defendant-deputies PEREZ and FLORA objected to taking Abdul back to the ER. PEREZ and FLORA wanted to punish Abdul for leaving the ER and creating another radio call. PEREZ announced that Abdul had already ruined his chance of getting any type of medical care.

50. A doctor and nurse at Scripps hospital had informed AGUILERA and PHILLIPS, less than an hour before, that Abdul was paranoid, delusional, incompetent, unable to care for his own safety or make appropriate medical decisions, and required an emergency medical evaluation. Neither PHILLIPS nor AGUILERA had probable cause to believe that Abdul had committed any crime.

Nonetheless, PEREZ and FLORA suggested, and PHILLIPS and AGUILERA agreed, to arrest Abdul for being under the influence of a controlled substance.

51. At 12:22 am, AGUILERA and PHILLIPS updated police dispatch that they would be transporting Abdul to the Vista Detention Facility and not to Scripps Encinitas. Scripps Encinitas Hospital was only one mile away from the Valero Gas Station, or a three-minute drive. By contrast, the Vista jail was about eighteen miles away.

52. Once they arrived at the Vista jail, PHILLIPS and AGUILERA exited the patrol car. Abdul exhibited bizarre behavior. He bounced around in the back seat of the patrol car and hit his head on the plexiglass separating the back seat from the cargo area. Abdul suffered a cut on his head that began to bleed. He was paranoid and agitated.

53. Abdul became calm and AGUILERA removed him from the patrol car. Abdul walked to a nearby bench and sat down. He was cooperative and complied with deputy's instructions, but made bizarre statements, such as "Please don't shoot." AGUILERA walked away to speak with Vista jail deputies. PHILLIPS remained with Abdul at the bench. Abdul was handcuffed while seated on the bench.

54. At approximately 12:49 am, Abdul began to stand up and PHILLIPS put his hand on him. Abdul either fell to the ground or was taken down by PHILLIPS. Defendant KAAPKE came over. KAAPKE grabbed Abdul's legs to hold him down while PHILLIPS held down Abdul's arms. Abdul's head hit the concrete ground. KAAPKE wrapped Abdul's legs with his own and locked them down. CHP officer LIEKKIO grabbed Abdul's ankles and held them down. Another deputy, Defendant JONES, arrived and placed pressure on Abdul to hold him down. PHILLIPS grabbed Abdul's arms; PHILLIPS and/or AGUILERA held down the upper part of Abdul's body. AGUILERA further restrained Abdul's neck. LIEKKIO grabbed a WRAP restraint device from a patrol vehicle.

ABERLE secured the WRAP restraints on Abdul's ankles. KAAPKE secured the restraints on Abdul's legs and clicked some of the buckles. AGUILERA and PHILLIPS secured the straps on Abdul's upper body. Defendants completed placing the WRAP device on Abdul at around 12:54 am. Abdul was restrained by the body weight of all six defendants for approximately five minutes.

55. After placing the WRAP restraint on Abdul, Defendants laid him down in a prone position. Deputies who are properly trained on the use of hobbling restraints know that restrained individuals should be placed and maintained in the recovery position, sitting upright or standing to facilitate breathing and monitoring. Defendants, however, did not do this for Abdul. Defendants did not properly monitor Abdul as he deteriorated and showed signs of medical distress.

56. Before the use of force, AGUILERA had radioed for paramedics on a non-expedited basis because Abdul was bleeding. But after the use of force, none of the law enforcement defendants attempted to provide an update on Abdul's deteriorating condition, or asked for paramedics to expedite, or cleared paramedics to enter the jail or the scene. The paramedics had parked near the jail at approximately 12:54 am, but they did not enter the jail until approximately 1:10 am. Paramedics arrived at approximately 1:13 am and took Abdul's blood pressure, which was dangerously low (79/51), and his oxygen saturation, which also was low (94). About 5 minutes later, while still prone and restrained by the WRAP, Abdul was found to be not breathing and unresponsive. At 1:28 am, paramedics documented Abdul had no pulse and they began CPR. Abdul was transported to Tri-City Medical Center where he eventually died in the early morning hours of March 3, 2024.

## V. *MONELL* MUNICIPAL LIABILITY ALLEGATIONS

57. Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same by reference as if fully set forth herein.

**A. The San Diego County Sheriff's Department Has a Custom and Practice of Depriving Arrestees Suspected of Intoxication and Mental Illness of Urgently Needed Medical Care.**

58. The San Diego County Sheriff's Department has a longstanding custom of arresting individuals suspected of acute intoxication and booking them into jail rather than first diverting arrestees to hospitals for medical clearance and emergency medical care. Intoxication can be fatal and some arrestees exhibit signs of medical distress while intoxicated, or have medical or mental health emergencies that resemble intoxication.

59. Moreover, individuals who suffer from mental health issues are more likely to suffer from substance abuse and substance use disorders. The 2022 National Survey on Drug Use and Health conducted by the Substance Abuse and Mental Health Services Administration (SAMHSA) found that individuals with mental illness were more likely than those without mental illness to be a user of illicit drugs. An estimated 52.9 percent of adults aged 18 or older with serious mental illness, and 43.9 percent of adults with any mental illness, abused illicit substances in 2022. In comparison, only 20.6 percent of adults with no mental illness abused illicit substances.

60. The SANDAG Regional Criminal Justice Research & Clearinghouse Division compiles and publishes statistics and data regarding arrests in San Diego County. In November 2021, SANDAG issued a bulletin noting methamphetamine "remained the drug of choice for adults arrested and booked into local jails in the San Diego region in 2020, with 56% testing positive for meth at the time of their arrest, which is even higher than the 45% that tested positive for marijuana."

61. In June 2023, SANDAG's Criminal Justice division published a report stating that "three in four arrestees in the San Diego region tested positive for at least one substance." In 2022, 77% of adult males arrested tested positive

for at least one illicit substance. Methamphetamine and marijuana were the most common drugs to have been recently used by arrestees.

62. "At the time of arrest and detention, it has been estimated that 70 to 80 percent of all inmates in local jails and State and Federal prisons had regular drug use or had committed a drug offense, and 34 to 52 percent of these inmates were intoxicated at the time of their arresting offense." Center for Substance Abuse Treatment, 2006, Detoxification and Substance Abuse Treatment, Treatment Improvement Protocol (TIP) Series, No. 45, HHS Publication No. (SMA) 15-4131, Rockville, MD: Substance Abuse and Mental Health Services Administration.

63. "Drug or alcohol intoxication has accounted for an increasing share of deaths in local jails over time. It accounted for 15% of all deaths in 2019, after suicide and heart disease (25%). The rate of intoxication deaths more than quadrupled, from 6 per 100,000 in 2000 to 26 per 100,000 in 2019." E. Ann Carson, 2021, "Mortality in Local Jails, 2000-2019 - Statistical Tables," Bureau of Justice Statistics Statistical Tables, Washington, DC: U.S. Department of Justice, Bureau of Justice Statistics.

64. Arresting individuals who are intoxicated and under the influence of illicit substances, and who also suffer from serious medical or mental health issues, is a frequent and recurring situation that San Diego County Sheriff's deputies encounter on a daily basis.

65. The San Diego County Sheriff's Department has a custom and practice of arresting individuals in need of urgent medical intervention and booking such arrestees into jail rather than first sending them to a hospital for medical clearance, including treatment and stabilization. Sheriff's deputies frequently arrested and booked individuals exhibiting medical distress for being "under the influence." The County of San Diego was aware of a persistent and recurring pattern of preventable deaths and serious injuries caused by Sheriff's

deputies' refusal to obtain emergent medical care for intoxicated and/or mentally ill arrestees who were exhibiting signs of distress. The County was aware of the existence of this custom and practice before the death of Abdul Kamara based on the following incidents:

a. In February 2009, Christopher Trujillo was arrested for a DUI. He began having seizures 45 minutes after being placed in a cell at the Vista Detention Facility. Mr. Trujillo died soon after booking from methamphetamine, heroin and alcohol intoxication.

b. In May 2009, Ronald Scimeca was booked into the San Diego Central Jail. He had a history of arrests for being drunk in public. Mr. Scimeca died hours after he was booked into jail due to alcohol withdrawal.

c. In December 2009, Daniel Jordon was observed to be sweating and twitching while booked into the Central Jail. He died one hour later from a methamphetamine overdose.

d. In September 2012, arresting officers suspected Bernard Victorianne ingested a baggie of methamphetamine during his arrest. Sheriff's Department personnel were told to immediately transport Mr. Victorianne to the emergency department if he exhibited signs of intoxication. Mr. Victorianne began to act in a bizarre manner with altered mental status. He complained that his insides were on fire. Despite signs that he was suffering from acute intoxication, Sheriff's Department personnel did not transport Mr. Victorianne to the hospital. He died of methamphetamine intoxication.

e. On June 5, 2013, deputies followed Hugo Barragan to his home due to a traffic violation. Once at his home, deputies repeatedly tased Mr. Barragan, punched him and beat him, and unleashed a canine on him. They placed Mr. Barragan in restraints. The Medical Examiner determined Mr. Barragan died due to sudden cardiac arrest with acute

methamphetamine and quetiapine intoxication during law enforcement restraint.

f. In August 2013, David Bruce Inge was booked into the Vista Detention Facility where a deputy saw him drop a baggie of methamphetamine. Inge was found dead in his cell hours later from a methamphetamine overdose. He died 18 hours after his booking.

g. In October 2013, Zdzislaw Bieruta was arrested and booked into the Vista Detention Facility for being drunk in public. Bieruta suffered from chronic alcoholism. He died hours later in jail.

h. In February 2014, Ronnie Sandoval was disoriented and sweating profusely after deputies arrested him and booked him into the Central Jail. Mr. Sandoval swallowed a bag of methamphetamine at the time of his arrest. He died hours later in the jail due to a methamphetamine overdose. In 2024, a San Diego County jury awarded nearly $2 million to the family of Ronnie Sandoval for the failure to provide necessary medical care to Mr. Sandoval.

i. On April 13, 2015, Lucky Phounsy became agitated and paranoid, believing his family was going to be attacked. He called 911 for help. Sheriff's Department deputies responded. Instead of treating Mr. Phounsy as a mentally distressed person and taking Mr. Phounsy to the hospital for care, deputies tased, punched, handcuffed, and restrained Mr. Phounsy. Mr. Phounsy died due to the deputies' use of force. The Sheriff's Department attributed Mr. Phounsy's death to his use of MDMA (Ecstasy). A San Diego County jury later awarded $85 million to the family of Lucky Phounsy.

j. In June 2016, Adrian Sanchez was booked into the San Diego Central jail after possibly ingesting drugs. X-ray images showed a concealed item in his abdominal area. Mr. Sanchez suffered seizures during the

booking process and subsequently died of acute methamphetamine intoxication.

k. In March 2017, Bruce Madsen Stucki was booked into the Vista Detention Facility after being arrested for public intoxication after wandering into traffic. He died from alcohol withdrawal two days later after he was found hallucinating in his cell.

l. In August 2017, deputies arrested Ivan Prieto for public intoxication. He was supposed to be a "book and release" inmate meaning he was supposed to be released after sobering up. Mr. Prieto died in the jail shortly after booking due to acute methamphetamine and cocaine intoxication.

m. On October 14, 2017, a Hobby Lobby store manager in Vista called the Sheriff's Department to obtain help for Kristopher Birtcher, who was disoriented and staggering. Instead of providing medical aid, deputies, who believed Birtcher was either mentally ill or under the influence of drugs, tackled, tased, and punched Birtcher. A deputy hit Birtcher's head up to eight times with a sap. Deputies handcuffed, hobbled, and hogtied Birtcher, placed a spit sock over his face, and he complained that he couldn't breathe. Deputies forced him prone on the ground for over ten minutes total with body weight and downward pressure on his body, including for approximately four minutes after he was limp and unconscious. Deputies also obstructed paramedics from assessing, treating, or transporting Birtcher for several minutes. The Medical Examiner determined Birtcher's death to be a restraint-related homicide.

n. On August 28, 2017, Kenneth Rice was booked into the Central Jail. He died less than two days later due to methamphetamine and benzodiazepine intoxication.

o. In February 2018, Paul Silva died in the Central Jail less than 48 hours after booking. Mr. Silva was a "book and release" inmate who had been arrested for being under the influence. He also suffered from schizophrenia. While at the Central Jail, deputies pepper sprayed, tased, and restrained Mr. Silva who died of restraint asphyxia.

p. On February 28, 2018, Sheriff's deputies went to the home of Oscar Leal in response to a 911 call. Mr. Leal was acting irrationally and expressing paranoid thoughts, claiming someone was "after him." Deputies arrested Mr. Leal for being under the influence of a controlled substance. While transporting Mr. Leal to the Vista Detention Facility, Mr. Leal began to scream and bang his head on the interior of patrol car. The arresting deputy deployed OC spray. Once at the Vista jail, deputies placed Leal in restraints. Mr. Leal stopped breathing and passed away an hour later. The Medical Examiner's report regarding Oscar Leal's death noted, "this is a sudden cardiac death due to acute methamphetamine toxicity in the setting of agitation, physical altercation and prone restraint." The manner of death was classified as a homicide. In public statements to The Union-Tribune, then-Sheriff Gore disputed the characterization of Mr. Leal's death as a "homicide" and blamed his death on Mr. Leal's use of methamphetamine.

q. On August 16, 2018, Sheriff's deputies responded to calls that Marco Antonio Napoles-Rosales was trespassing and behaving strangely at a Circle K gas station in Fallbrook. Sheriff's deputies wrestled Rosales to the ground after Rosales did not leave and continued to pace near the Circle K. Deputies tased Rosales and eventually placed him in a WRAP restraint device. Rosales died shortly thereafter. The Medical Examiner determined the cause of death to be sudden

cardiopulmonary arrest associated with methamphetamine intoxication and physical exertion during law enforcement restraint.

r. In February 2019, Joseph Castiglione died hours after being booked into the Vista Detention Facility on drug possession charges. Castiglione swallowed a baggie of methamphetamine at the time of his arrest but received no care. The Medical Examiner determined the cause of death to be acute methamphetamine toxicity.

s. In July 2019, Michael Bush died hours after being booked into the San Diego Central Jail due to methamphetamine intoxication. A baggie was found in Mr. Bush's GI tract during the autopsy.

t. On February 18, 2020, a Sheriff's deputy responded to calls that a man was acting erratically while sitting amid traffic. A deputy encountered Joseph Jimenez who was making strange noises and speaking incoherently. The deputy believed Jimenez was under the influence and suffering from "excited delirium." Jimenez was not combative. He covered the side of his head with his arms as he lay in a prone position. The deputy applied a carotid restraint hold on Jimenez who promptly lost consciousness. Another deputy arrived and the two deputies restrained Jimenez's arms and legs. While in transit to the hospital, Jimenez stopped breathing and had no pulse. He eventually died several days later. The Medical Examiner determined the cause of death to be anoxic-ischemic encephalopathy due to resuscitated cardiopulmonary arrest due to acute methamphetamine intoxication.

u. On January 6, 2021, Tammy Wilson called Sheriff's dispatch requesting medical and mental health assistance for her husband, Omar Moreno. Ms. Wilson told the Sheriff's deputies who arrived on scene that she was concerned Mr. Moreno had a serious mental health

issue. Deputies took his pulse which they measured at 140 beats per minute. Mr. Moreno was speaking in an irrational and nonsensical manner. Ms. Wilson sought to have her husband transported to a hospital for medical care. Instead, deputies arrested Mr. Moreno for being "under the influence" and attempted to book him into the Central Jail. Because the charge was a non-bookable offense pursuant to Covid protocols in place at the time, the arresting deputy changed the charges to a violation of Penal Code § 647(f), meaning Mr. Moreno was under the influence and unable to care for himself. Minutes after charging Mr. Moreno with a violation of Penal Code § 647(f), the arresting deputy, Deputy Rembold, told the jail intake nurse that Mr. Moreno was *not* under the influence and *not* intoxicated. Mr. Moreno died approximately 5 hours later after choking on a mask – bizarre behavior resulting from acute methamphetamine intoxication.

66. The foregoing deaths occurred because Sheriff's deputies refused to first obtain emergency medical care and hospitalization for arrestees and inmates, ignoring the need to provide emergent care to intoxicated and/or mentally ill individuals and, instead, immediately criminalizing the conduct of arrestees and inflicting detention as extrajudicial punishment. In these cases, deputies sought to arrest individuals and book them into jail to avoid further contact or having to escort them through the hospital process, rather than first diverting such arrestees to a hospital for medical care, or immediately seeking emergency medical care when arrestees began to exhibit signs of distress.

67. The foregoing incidences of grievous harm and injury to those arrested and detained by subordinates of the Sheriff's Department placed County officials on notice of the need to take remedial action. Despite its awareness that deputies and other subordinates were failing to provide urgent medical attention to

arrestees and detainees, San Diego County Sheriff's Department officials failed to take any action to correct the acts, or failures to act, of its subordinates, thereby inflicting widespread constitutional injury.

**B. The San Diego County Sheriff's Department Failed to Properly Train, Supervise, and Discipline Deputies Who Used Unreasonable Force and Improper Restraint Methods.**

68. The application of pressure and body weight can significantly contribute to positional asphyxia. Officers must be trained to avoid restraining techniques that block the flow of air into a person's lung, which can contribute to positional, or restraint, asphyxia.

69. In the civil litigation related to Kristopher Birtcher's death, discovery material demonstrated that the Sheriff's Department trained its officers on "swarm" techniques, which involves the use of multiple deputies when taking down a suspect. The Sheriff's Department trained its deputies that they can apply body weight, including that of multiple deputies, to a person's legs, torso, shoulder, or back, including with their knees, while the person is being restrained. The Department's training encouraged deputies to use the full body weight of multiple officers on a prone person. Deputies were told that 2, 3, or 4 of them could get on top of a person to control a person who is not complying. Contrary to national standards and best practices, the Department *did not* train deputies to try to minimize the amount of weight applied to someone's chest or back while in a prone position; instead, it trained them that they may have to apply additional body weight.

70. The Department admitted during the *Birtcher* litigation that it did not train its deputies on the "physiology of a struggle"—an individual may struggle because of potentially restricted breathing, and deputies should be aware that a person may be attempting to alleviate pressure to breathe better, rather than engaging in purposeful resistance. Deputies were not trained to avoid responding

with more force that could exacerbate the problem. The deputies' prone restraint of Abdul reflects that the Department still had inadequate training on these standard, lifesaving concepts.

71. Before the death of Abdul Kamara, the Sheriff's Department was aware that its deputies were killing individuals by using excessive and unreasonable restraint methods. The San Diego County Sheriff's Department was aware of the following deaths stemming from the improper use of restraints by its deputies:

a. In 2008, Jeff Dewall died after being subjected to forceful prone restraint, a spit sock, and attempted placement in a restraint chair. Two deputies got on top of his back and used downward pressure and body weight to restrain him. Dewall could not breathe. He died of positional asphyxia.

b. In 2009, deputies killed Tommy Tucker. Tucker died from asphyxia after being forcibly held face down on the ground, placed in a spit sock, and subjected to a carotid restraint and chokehold. Tucker pled with deputies that he could not breathe.

c. In 2013, deputies killed Hugo Barragan at his home. He was hogtied with a dog leash. The excessive force used by deputies and the circumstances of Mr. Barragan's death are described in a preceding paragraph, *see supra*. None of the officers involved in this incident were further investigated or subject to discipline or remedial training.

d. In 2015, as described in the foregoing section, Sheriff's deputies killed Lucky Phounsy after restraining him. *See supra*. None of the officers involved in the Phounsy incident were further investigated by Internal Affairs or subject to discipline, and the County made no changes to its training or policies as a result, even after a federal jury

determined that Phounsy's death was caused by a deputy's excessive prone restraint and the County's deliberately indifferent training.

e. In May 2017, Mark Adkins died after Sheriff's deputies repeatedly tased him, wrestled him into submission, and handcuffed, hobbled, and used forceful prone restraints. No deputy faced discipline.

f. In October 2017, Kristopher Birtcher died after Sheriff's deputies used unreasonable force and restrained him. *See supra*. No deputy involved in Birtcher's death was subject to discipline or further training.

g. In 2018, Paul Silva, Oscar Leal, and Marco Napoles-Rosales all died after Sheriff's deputies used restraints on these individuals. *See supra*. None of the deputies involved in these deaths were investigated by Internal Affairs, subject to discipline, or given additional training.

h. In 2019, then-Sheriff Gore hotly disputed the Medical Examiner's classification of the death of Oscar Leal as a homicide. The Medical Examiner had attributed Leal's death in part to the use of restraints. Gore told the Union-Tribune that "[i]t was purely due to Leal's agitation that he was restrained." Gore further stated that "[w]ere it not for Mr. Leal's abuse of methamphetamine, he would be alive today."

i. In 2020, Joseph Jimenez died after Sheriff's deputies used restraints. *See supra*.

72. The deaths of Dewall, Tucker, Barragan, Phounsy, Adkins, Birtcher, Silva, Leal, Rosales, and Jimenez, and the jury verdict and judgment in the Phounsy case, all placed the Sheriff's Department on notice of a custom and practice of deputies using restraints in an excessive and unreasonable manner that led to deaths. The Sheriff's Department, however, refused to conduct unbiased investigations to determine whether deputies had committed misconduct; refused

to hold individual deputies accountable; refused to discipline individual deputies who used unreasonable force; and refused to correct known training and policy deficiencies. This has created a culture of apathy and impunity at the Sheriff's Department. Because it is impossible for any individual Sheriff's Department subordinate to suffer discipline, there is a custom of encouraging neglect and abuse of arrestees, and Department personnel are permitted to act with impunity.

73. Additionally, the deaths of Dewall, Tucker, Barragan, Phounsy, Adkins, Birtcher, Silva, Leal, Rosales, and Jimenez all placed the Sheriff's Department on notice of the need to further train deputies regarding the proper use of restraint methods to avoid death or serious injury to arrestees.

## DELAYED DISCOVERY AND ACCRUAL OF TORT CLAIMS

74. After Abdul Kamara's death, the San Diego Police Department (SDPD) issued a press release on March 11, 2024, that revealed limited details regarding the circumstances of Abdul's death. That press release named the individual Sheriff's Department employees who are listed as defendants in this case: Aguilera, Phillips, Aberle, Heard, Kaapke, and Jones.

75. On March 27, 2024, Fredrika Nabbie submitted a California Public Records Act (CPRA) request to the Sheriff's Department requesting all records, including reports, witness statements, audio and video files, related to the death of Abdul Kamara on March 3, 2024. On April 4, 2024, the Sheriff's Department rejected the CPRA request, contending that the records requested related to an "active, pending law enforcement investigation or criminal proceeding."

76. Ms. Nabbie further requested a copy of the Medical Examiner's Investigative Report and Autopsy related to Abdul Kamara. On June 4, 2024, the Medical Examiner responded as follows to this request: "Your request has been received and entered into our system, however at this time the case is sealed by law enforcement pursuant to Government Code § 7922. Until the seal is rescinded, we cannot release any documents or information regarding this case. As each case is

unique, it is impossible to say when this might be, but as soon as the seal is removed, reports will be sent to you automatically. For more information, please contact the San Diego Police Department."

77. On September 23, 2024, SDPD contacted counsel for Ms. Nabbie to inform counsel that the law enforcement hold on the Medical Examiner's reports could not be removed, and no information could be released, as the death of Abdul Kamara was still under investigation and review by the District Attorney's Office.

78. On December 9, 2024, the District Attorney's Office met with the family of Abdul Kamara and Plaintiffs' counsel to provide them with a letter detailing the DA's office review of this incident. That day, for the first time, Plaintiffs became aware of the existence and identity of CHP Officer Klayton Liekkio due to the District Attorney's letter noting Officer's Liekkio's role in the use of force against Abdul Kamara.

79. After the meeting with the District Attorney's Office, Ms. Nabbie's representatives submitted renewed CPRA requests to both the San Diego County Sheriff's Department and SDPD requesting the reports, records, audio and video evidence related to Abdul Kamara's death. These requests were again denied. Ms. Nabbie's representative also contacted the Medical Examiner's Office again to renew the family's request for the autopsy and investigative report.

80. On January 24, 2025, the Medical Examiner finally released the autopsy report to the family of Abdul Kamara. The Medical Examiner's report purported to summarize the jail surveillance video and body-worn camera (BWC) video of Mr. Kamara's death. The report described a delay in the arrival of the Vista Fire Department personnel and paramedics and a delay in providing emergency medical services once Mr. Kamara stopped breathing and became nonresponsive. On February 12, 2025, the Estate of Abdul Kamara and Fredrika Nabbie submitted their respective tort claims to the City of Vista (related to the

conduct of Fire Department personnel and paramedics) and the State of California (related to the conduct of CHP Officer Liekkio).

81. On February 21, 2025, the City of Vista informed Plaintiffs it would decline to take action on the claims because the claims were "not presented within six months after the event or occurrence as required by law. See Sections 901 and 911.2 of the Government Code. Because the claim was not presented within the time allowed by law, no action has been taken on the claim."

82. This, however, is not an accurate statement of the law. Government Code § 911.2(a) states, "[a] claim relating to a cause of action for death or for injury to person or to personal property or growing crops **shall be presented as provided in Article 2 (commencing with Section 915) not later than six months after the *accrual* of the cause of action**." (Emphasis added.)

83. Under the Government Claims Act, the date of accrual for a tort claim against a public entity is the same date that would apply to a dispute between private litigants. Gov. Code § 901; *Rubenstein v. Doe No. 1*, 3 Cal. 5th 903, 906 (2017). Although a cause of action generally accrues at the time when the claim is complete with all its elements, one "important exception to the general rule of accrual is the 'discovery rule,' which postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action." *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 807 (2005).

84. Therefore, decedent Abdul Kamara's and Fredrika Nabbie's causes of action accrued against the City of Vista and its employees on or about January 24, 2025, when Plaintiffs received the Medical Examiner's report. Their causes of action accrued against the State of California and CHP Officer Liekkio on or about December 9, 2024, when the District Attorney's Office provided the letter to Abdul Kamara's family.

# VI. CAUSES OF ACTION

## A. FIRST CAUSE OF ACTION – 42 U.S.C. § 1983

**Objectively Unreasonable Deprivation of Medical Care for Abdul Kamara (Fourth and Fourteenth Amendments)**

**[By the Estate of Abdul Kamara against Defendants AGUILERA, PHILLIPS, KAAPKE, JONES, ABERLE, LIEKKIO, HEARD, PEREZ, FLORA, APPLEGATE, COREY, HAPROFF, LAMORANDIER, and DOES 4-10 and 15-50]**

85. Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same by reference as if fully set forth herein.

86. As an arrestee, Abdul Kamara had a clearly established right to medical care under the Fourth and Fourteenth Amendments. *See City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983).

87. Under either Amendment, the standard is one of objective unreasonableness.

88. At the time that Defendants AGUILERA and PHILLIPS arrested Abdul Kamara for being under the influence, they knew the following: (1) Abdul had eloped from the emergency department at Scripps Hospital; (2) Abdul was paranoid, delusional, incompetent to make medical decisions, and unable to care for his own safety; (3) Abdul required an emergency medical evaluation; and (4) hospital staff, including the ER physician, expressly instructed the deputies to return Abdul to the hospital for a medical hold after locating him. AGUILERA and PHILLIPS encountered Abdul approximately 45 minutes after the hospital staff told them to return Abdul to the hospital for a medical hold once they located Abdul. They were only 1 mile away from Scripps Hospital and about 18 miles from the Vista jail.

89. Despite this information, PEREZ, FLORA, AGUILERA and PHILLIPS decided to transport Abdul to the Vista Detention Facility instead of

the hospital that was 3 minutes away. Thus, PEREZ, FLORA, AGUILERA and PHILLIPS: (1) made the purposeful decision to take Abdul to jail instead of the hospital for a medical hold and evaluation, as they had been instructed by a doctor; (2) their intentional decision placed Abdul at risk of serious harm because medical professionals stated that something was wrong with Abdul and that he required evaluation and assessment at the hospital; (3) PEREZ, FLORA, AGUILERA and PHILLIPS acted with reckless disregard to Abdul's rights and safety because they knew he required a medical evaluation and Abdul did not pose a risk or threat to the officers or the public – Abdul was polite, compliant, and cooperative at the Valero gas station when the officers decided *not* to return Abdul to the hospital; and (4) by refusing to return Abdul to the hospital for a medical evaluation, PEREZ, FLORA, AGUILERA and PHILLIPS caused Abdul injury and harm.

90. Defendant HEARD was the designated WRAP safety officer who was responsible, along with others, for ensuring that Abdul was not in medical distress. After Defendants AGUILERA, PHILLIPS, KAAPKE, JONES, and ABERLE completed securing the WRAP restraint on Abdul, HEARD asked Abdul if he was injured. Abdul reported that his mouth and head were injured. Abdul had hit his head with such force during the incident that he suffered a subarachnoid hemorrhage. Yet, HEARD did nothing to ensure timely medical care in response to Abdul's complaints of injury and pain.

91. There was a nearly 20-minute delay in the arrival of the paramedics. Defendants AGUILERA, PHILLIPS, KAAPKE, JONES, ABERLE, LIEKKIO, HEARD, and DOES 4-10 did not timely summon medical care and failed to provide needed medical care to Abdul while he lay on the ground in the WRAP restraint. Defendants should have placed and maintained Abdul in a recovery, seated upright or standing position to facilitate breathing. Although medical personnel are available at the Vista Detention Facility and nurses are stationed

near the Vista jail sallyport where Abdul laid, AGUILERA, PHILLIPS, KAAPKE, JONES, ABERLE, LIEKKIO, HEARD, and DOES 4-10 did not request a jail medical nurse or doctor to assess Abdul or check his vitals to ensure he was stable. They did not examine him for injuries. Defendants left Abdul laying on the ground for almost 20 minutes until paramedics arrived.

92. The Vista Fire Department paramedics, APPLEGATE, COREY, HAPROFF, and LAMORANDIER, arrived almost 20 minutes after the WRAP had been placed on Abdul. Although Abdul was dangerously hypotensive and became unresponsive, APPLEGATE, COREY, HAPROFF, and LAMORANDIER did not immediately re-position Abdul so he was in the recovery position or upright and did not immediately order the WRAP to be loosened or the handcuffs removed. They failed to provide urgently needed medical care to Abdul for 15 minutes until Abdul lost his pulse at 1:28 am. APPLEGATE, COREY, HAPROFF, and LAMORANDIER only requested the WRAP restraint and handcuffs be removed at this point and only began lifesaving measures once Abdul became pulseless.

93. As a direct and proximate result of Defendants' objectively unreasonably conduct toward Abdul's serious medical condition, Abdul experienced physical pain, severe emotional distress, and mental anguish, as well as the loss of his life and enjoyment of life and other damages as alleged herein.

94. The conduct of Defendants alleged herein caused Abdul Kamara to be deprived of his civil rights that are protected under the United States Constitution which has also legally, proximately, foreseeably and actually caused Abdul Kamara to suffer emotional distress, pain and suffering and death and further damages all in an amount to be shown according to proof at the time of trial.

95. The conduct as alleged herein was done in deliberate or reckless disregard of Abdul's constitutionally protected rights, justifying the award of

exemplary damages against Defendants in an amount to be shown according to proof at the time of trial in order to deter the Defendants from engaging in similar conduct and to make an example by way of monetary punishment.

96. Plaintiff is also entitled to an award of attorney fees and costs of suit herein.

**B. SECOND CAUSE OF ACTION - 42 U.S.C. § 1983**

**Excessive and Unreasonable Force (Fourth Amendment)**

**[By Plaintiff Estate of Abdul Kamara against Defendants AGUILERA, PHILLIPS, KAAPKE, JONES, ABERLE, LIEKKIO, HEARD, and DOES 4-10, 21-50]**

97. Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same by reference as if fully set forth herein.

98. The Fourth Amendment to the United States Constitution, as applied to these State Defendants by the Fourteenth Amendment, provides the right of every person to be free from the use of unreasonable and excessive force by police officers.

99. Defendants AGUILERA, PHILLIPS, KAAPKE, JONES, ABERLE, LIEKKIO, and HEARD had no information that Abdul had committed any crime, had no information that Abdul had any outstanding warrants, and had no information that Abdul had harmed any person. Abdul had not resisted any officer commands; had not threatened any officer; did not flee; and had not acted in a threatening manner. Abdul only acted in a bizarre, paranoid manner that evidenced distress and illness.

100. Defendants AGUILERA and PHILLIPS knew that Abdul had just eloped from a hospital emergency room, was delusional, paranoid, unable to care for himself, and in need of medical care. AGUILERA and PHILLIPS had been told to return Abdul to the hospital for a medical hold.

101. Although AGUILERA and PHILLIPS arrested Abdul for being under the influence, a misdemeanor, Abdul had not committed any crime in their presence. They did not have probable cause to believe Abdul had committed any crime. AGUILERA and PHILLIPS described Abdul as cooperative and compliant with all officer directives and commands. Abdul did not resist, did not threaten anyone, and did not pose a threat or danger to the officers or the public. Abdul was simply a sick person who required medical attention.

102. The conduct that precipitated Defendants' use of body weight, compressional force, and restraints on Abdul Kamara at the Vista Detention Facility was not a crime – Abdul started to stand up while handcuffed, PHILLIPS put his hand on Abdul, and Abdul fell. Abdul had not attacked PHILLIPS or any other officer while handcuffed on the bench at the Vista Detention Facility. He had not attempted to flee or run away.

103. Defendants AGUILERA, PHILLIPS, KAAPKE, JONES, ABERLE, LIEKKIO, and HEARD used excessive and unreasonable force against Abdul when they restrained Abdul on the ground with compressional force and using mechanical restraints that restricted his ability to breathe. Defendants forced downward pressure on Abdul with their body weight and restrained him for approximately 5 minutes. Once Defendants placed the WRAP restraint on Abdul, they did not place and maintain him in the recovery position, sit him upright or cause him to stand, and did not properly monitor his condition as required. Instead, they kept Abdul prone on the ground, restrained in a dangerous position that restricted his breathing. Defendants used unreasonable deadly force against an unarmed, restrained, and outnumbered individual who posed no immediate threat of death or serious bodily injury at the time of the incident.

104. Defendants' acts and omissions deprived Abdul of his right to be secure in his person against unreasonable searches and seizures as guaranteed to

Abdul under the Fourth Amendment to the United States Constitution and applied to state actors by the Fourteenth Amendment.

105. As a result of the foregoing, Abdul suffered great physical pain and suffering up to the time of his death. He suffered the loss of enjoyment of his life, loss of life, and loss of his earning capacity. Defendants are liable for Abdul's harm, injuries, and death because they were integral participants and/or because they failed to intervene to prevent these violations.

106. The conduct as alleged herein was done in deliberate or reckless disregard of Abdul's constitutionally protected rights, justifying the award of exemplary damages against Defendants in an amount to be shown according to proof at the time of trial in order to deter the Defendants from engaging in similar conduct and to make an example by way of monetary punishment.

107. Plaintiff is also entitled to an award of attorney fees and costs of suit herein.

**C. THIRD CAUSE OF ACTION – 42 U.S.C. § 1983**

**Deprivation of the Right of Association (Fourteenth Amendment)**

**[By Plaintiff Fredrika Nabbie against Defendants AGUILERA, PHILLIPS, KAAPKE, JONES, ABERLE, LIEKKIO, HEARD, PEREZ, FLORA, APPLEGATE, COREY, HAPROFF, LAMORANDIER, and DOES 4-10 and 15-50]**

108. Plaintiffs reallege all prior paragraphs of this complaint and incorporates the same herein by references.

109. The aforementioned acts and/or omissions of AGUILERA, PHILLIPS, KAAPKE, JONES, ABERLE, LIEKKIO, HEARD, PEREZ, FLORA, APPLEGATE, COREY, HAPROFF, LAMORANDIER, and DOES 4-10 and 15-50 caused the untimely, preventable, and wrongful death of Abdul Kamara and deprived Plaintiff Fredrika Nabbie of her liberty interest in her relationship with

her son, in violation of her substantive due process rights as defined by the First and Fourteenth Amendments to the United States Constitution.

110. The conduct of Defendants AGUILERA, PHILLIPS, KAAPKE, JONES, ABERLE, LIEKKIO, HEARD, PEREZ, FLORA, APPLEGATE, COREY, HAPROFF, LAMORANDIER, and DOES 4-10 and 15-50 was done with deliberate indifference to the rights of Abdul Kamara. Defendants' conduct was unrelated to any legitimate law enforcement objective.

111. There was no exigency or quickly evolving circumstances that warranted the denial of medical care to Abdul Kamara when Defendant AGUILERA and PHILLIPS detained him at the Valero Gast Station. Likewise, no exigency or threatening circumstances warranted the use of force by Defendants at the Vista Detention Facility.

112. As a result of the conduct of these Defendants, Abdul Kamara died and Plaintiff Fredrika Nabbie was deprived of her relationship with her son. Defendants thus violated the substantive due process right of Plaintiff to be free from unwarranted interference with her familial relationship with Abdul.

113. The conduct as alleged herein was done in deliberate or reckless disregard of Plaintiffs' constitutionally protected rights, justifying the award of exemplary damages against Defendants in an amount to be shown according to proof at the time of trial in order to deter the Defendants from engaging in similar conduct and to make an example by way of monetary punishment.

114. Plaintiff is also entitled to an award of attorney fees and costs of suit herein.

### D. FOURTH CAUSE OF ACTION – *MONELL*

### Municipal Liability (42 U.S.C. § 1983)

### [By All Plaintiffs against Defendant County of San Diego]

115. Plaintiffs reallege all prior paragraphs of this complaint and incorporates the same herein by references.

116. There has been a longstanding pattern of failing to provide adequate medical causing a series of preventable and tragic deaths that placed Defendant County of San Diego on notice of the need for remedial action to prevent further harm.

117. As set forth in the preceding paragraphs of this complaint, the San Diego County Sheriff's Department has a custom and practice of arresting individuals in need of urgent medical intervention and booking such arrestees into jail rather than first sending them to a hospital for medical treatment and stabilization. The County was aware of this custom and practice due to the deaths and injuries suffered by arrestees and inmates as described in section IV of this complaint, *supra*.

118. There has been a custom and practice of acquiescence in the wrongful conduct of Sheriff's Department's subordinates. Defendant County failed to promulgate corrective policies and regulations in the face of repeated Constitutional violations. Defendant County condoned and acquiesced in the abusive behavior of its subordinates by refusing to retrain them, refusing to discipline them, and/or refusing to correct the abusive behavior of subordinates. The County further ratified the actions of deputies by failing to take any corrective or remedial action after the death of arrestees and inmates.

119. As set forth in the preceding paragraphs of Plaintiffs' complaint, which are incorporated herein by reference, Defendant County knew of these unconstitutional practices and customs inflicting grievous injury to vulnerable arrestees who were dependent on the Sheriff's Department for their care. The County knew its program regarding training, supervision, and discipline of subordinates, who violated the civil rights of arrestees, inmates, and citizens, was so inadequate that it was obvious that a failure to correct it would result in further incidents or dangerous or lawless conduct perpetrated by their subordinates.

120. Despite its awareness that Sheriff's deputies were using unreasonable and excessive force by employing inappropriate and improper restraint techniques, the Sheriff's Department did not further train its deputies or promulgate procedures to ensure the proper use of restraints.

121. The County is further liable because the cumulative and persistent failures and misdeeds of the entire Sheriff's Department which caused the ultimate injury and harm suffered by decedent Abdul Kamara. Plaintiffs' constitutional deprivations were caused by the subordinates' adherence to customs and practices as alleged herein. Therefore, the constitutional injuries suffered by Abdul Kamara and Fredrika Nabbie resulted from the collective inaction of the San Diego County Sheriff's Department. *See Fairley v. Luman*, 281 F.3d 913, 917 (9th Cir. 2002); *see also Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 604 (9th Cir. 2019).

122. As a result of all Defendants' historical failure to properly train, supervise, and discipline deputes, and its adoption and ratification of constitutionally deficient customs and practices related to the care of seriously ill arrestees and inmates, Defendant County of San Diego and each of its subordinates were deliberately indifferent to the needs of Abdul Kamara. These systemic failures and unconstitutional practices were the moving force behind the misconduct of the deputies and individual defendants in this case. The conduct of defendants inflicted prolonged pain and suffering to Abdul, causing his death, and depriving Fredrika Nabbie of the care, comfort, society, and companionship of her son.

**E. FIFTH CAUSE OF ACTION – BANE ACT**

**Violation of Cal. Civil Code § 52.1 (Survival Claim)**

**[By Plaintiff Estate of Abdul Kamara against Defendants AGUILERA, PHILLIPS, KAAPKE, JONES, ABERLE, LIEKKIO, HEARD, PEREZ, FLORA, APPLEGATE, COREY, HAPROFF, LAMORANDIER, DOES 4-10 and 15-50, COUNTY OF SAN DIEGO, and CITY OF VISTA]**

123. Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same by reference as if fully set forth herein.

124. Plaintiff Estate of Abdul Kamara brings the claims in this cause of action as survival claims permissible under California law, including Code of Civil Procedure, § 377.20 et. seq.

125. By their acts, omissions, customs, and policies, Defendants AGUILERA, PHILLIPS, KAAPKE, JONES, ABERLE, LIEKKIO, HEARD, PEREZ, FLORA, APPLEGATE, COREY, HAPROFF, LAMORANDIER, DOES 4-10 and 15-50, County of San Diego, and City of Vista, by threat, intimidation, and/or coercion, interfered with, attempted to interfere with, and violated Abdul Kamara's rights under California Civil Code § 52.1 and under the United States Constitution, California Constitution, and California law as follows:

a. The right to be free from objectively unreasonable treatment and deliberate indifference to Abdul Kamara's serious medical needs while in custody as an arrestee, as secured by the Fourth and/or Fourteenth Amendments to the United States Constitution and by California Constitution, Article 1, §§ 7 and 13;

b. The right to be free from excessive and unreasonable use of force under the Fourth Amendment;

c. Decedent's right to familial association as secured by the First and/or Fourteenth Amendments;

d. The right to enjoy and defend life and liberty; acquire, possess, and protect properly; and pursue and obtain safety, happiness, and privacy, as secured by the California Constitution, Article 1, § 1;

e. The right to protection from bodily restraint, harm, or personal insult, as secured by California Civil Code § 43; and

f. The right to prompt medical care for a detainee in police custody.

126. Defendants' violations of Decedent's due process rights with deliberate indifference, in and of themselves constitute violations of the Bane Act.

127. All of Defendants' violations of duties and rights, and coercive conduct described herein were volitional acts; none was accidental or merely negligent.

128. Further, each Defendant violated Decedent's rights with the specific intent and purpose to deprive them of their enjoyment of those rights and of the interests protected by those rights. Each defendant acted with reckless disregard for Abdul Kamara's rights.

129. Defendant County of San Diego is vicariously liable for the violation of rights by their employees and agents pursuant to Government Code § 815.2.

130. As a direct and proximate result of Defendants' violation of California Civil Code § 52.1 and of Plaintiff's rights under the United States and California Constitutions, Plaintiff sustained injuries and damages. Against each and every individual Defendant, Plaintiff is entitled to relief, including punitive damages against all individuals Defendants, and all damages allowed by California Civil Code §§ 52 and 52.1, including costs, attorneys' fees, treble damages and civil penalties.

## F. SIXTH CAUSE OF ACTION – BATTERY

**Survival Claim (CCP § 377.30)**

**[By Estate of Abdul Kamara against Defendants AGUILERA, PHILLIPS, KAAPKE, JONES, HEARD, ABERLE, LIEKKIO, DOES 4-10 and 20-50, and COUNTY OF SAN DIEGO]**

131. Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same by reference as if fully set forth herein.

132. Defendants AGUILERA, PHILLIPS, KAAPKE, JONES, HEARD, ABERLE, LIEKKIO, and DOES 4-10 and 20-50, while working as deputies and/or agents of the County of San Diego Sheriff's Department and/or California

Highway Patrol, and within the course and scope of their duties, unreasonably used body weight, compressional force, and restraints on Abdul Kamara. These Defendants touched and restrained Abdul Kamara with the intent to harm or offend him and had no legal justification for the use of force. Abdul did not consent to touch or contact with these Defendants and any reasonable person in Abdul's situation would have been offended by such contact with Defendants.

133. As a direct and proximate result of Defendants' conduct, Abdul Kamara sustained injuries and harm and eventually died.

134. The County of San Diego is vicariously liable for the wrongful acts of Defendants who are its employees pursuant to Government Code § 815.2(a).

135. The conduct of the individual Defendants AGUILERA, PHILLIPS, KAAPKE, JONES, HEARD, ABERLE, LIEKKIO, and DOES 4-10 and 20-50 was malicious, wanton, oppressive, and done with conscious disregard for the rights of Abdul Kamara, entitling Plaintiff to an award of exemplary and punitive damages.

**G. SEVENTH CAUSE OF ACTION – NEGLIGENCE**

**Survival Claim (CCP § 377.30)**

**[By Estate of Abdul Kamara against All Defendants]**

136. Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same by reference as if fully set forth herein.

137. Defendants had a duty to Abdul Kamara, under California Civil Code section 1714, to act with ordinary care and prudence so as not to cause harm or injury to another.

138. In evaluating, assessing and handling Abdul Kamara's medical condition, Defendants AGUILERA, PHILLIPS, KAAPKE, JONES, HEARD, ABERLE, PEREZ, FLORA, LIEKKIO, APPLEGATE, COREY, HAPROFF, LAMORANDIER, and DOES 4-10 and 15-50 failed to comply with professional and legal standards. These Defendants improperly, negligently, wrongfully, and recklessly failed to provide any medical care for Abdul's serious medical needs.

Defendants improperly, negligently, wrongfully, and recklessly delayed and failed to render medical care to Abdul Kamara who was in obvious physical distress and in acute need of medical care.

139. Law enforcement officers, including Defendants, have a duty to use reasonable care to prevent harm or injury to others. This duty includes providing medical care and attention to arrestees in distress, using appropriate tactics, giving appropriate commands, giving appropriate warnings, and not using any force unless necessary, using the least amount of force necessary, and providing prompt medical attention to injured or ill arrestees. These duties also include providing proper training and equipment to deputies so that they may perform their duties in accordance with the department policies, properly investigate use of force incidents, and punish, re-train, terminate, and/or prosecute violators of those policies and the law.

140. All Defendants breached duties of care. Upon information and belief, the actions and inactions of Defendants were negligent, grossly negligent, and reckless, including but not limited to:

a. The failure to properly and adequately assess the need to detain, arrest, and use force on or against decedent;
b. The failure to recognize the indicators of mental illness or impairment, and/or the failure to use proper tactics and techniques on person suffering from a mental illness or intoxication.
c. The negligent tactics and handling of the situation with decedent, including pre-force and post-force negligence;
d. The negligent detention, arrest, and use of force, including deadly force, against decedent;
e. The failure to provide prompt medical care to decedent;
f. The failure to enact proper policies, training, and supervision to enable deputies to properly handle encounters including those with

people suffering from a medical/mental health issue or intoxication, to properly assess the need to use force, and the type of force appropriate to the situation;

g. The failure to punish, discipline, re-train, and/or further monitor and supervise violators of Department policies and the law.

141. By engaging in the acts alleged herein, Defendants failed to act with ordinary care and breached their duty of care owed to Abdul Kamara.

142. The County is liable for its own negligent conduct, including for negligence per se, for violating a mandatory statutory duty of care under Gov. Code § 7286.5 to not authorize techniques or transport methods that involve a substantial risk of positional asphyxia.

143. The County of San Diego and City of Vista are also responsible for the acts and omissions of individual Defendants and Doe Defendants under the theory of *respondeat superior*.

144. As a direct and proximate result of the Defendants' negligent conduct as herein described, Abdul Kamara sustained injury and harm, including pre-death pain and suffering and the loss of his life.

### H. EIGHTH CAUSE OF ACTION – WRONGFUL DEATH

**Wrongful Death (CCP § 377.60)**

**[By Fredrika Nabbie against All Defendants]**

145. Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same by reference as if fully set forth herein.

146. As set forth in the preceding paragraphs, Defendants committed wrongful acts which proximately caused the death of Abdul Kamara. Specifically, all Defendants deprived Abdul Kamara of his rights under the United States Constitution and California Constitution to adequate medical care and to be free from the unreasonable and excessive use of force, and committed the torts of battery and negligence.

147. The County of San Diego and City of Vista are responsible for the acts and omissions of individual and Doe Defendants under the theory of *respondeat superior*.

148. The wrongful acts alleged above have destroyed the relationship between Plaintiff Fredrika Nabbie and decedent Abdul Kamara and inflicted damage and harm, including the loss of Abdul Kamara's society, companionship, care, comfort, and support and further economic and non-economic damages according to proof at the time of trial.

## VII. PUNITIVE DAMAGES

The conduct of all individual defendants as alleged herein was malicious, oppressive, fraudulent, and in reckless disregard of decedent's federally guaranteed rights. Plaintiffs seek punitive damages to punish and deter such conduct, as alleged in this complaint.

## VIII. PRAYER FOR RELIEF

Plaintiffs pray for judgment as follows:

1) For compensatory general and special damages in an amount in accordance with proof.
2) For punitive and exemplary damages as permitted by law.
3) For expenses and costs of suit, including reasonable attorneys' fees, as permitted by law.
4) For any other relief that is just and proper.

## IX. JURY TRIAL DEMAND

Pursuant to Rule 38 Federal Rules of Civil Procedure and the Seventh Amendment of the U.S. Constitution, Plaintiffs demand a jury trial.

DATED: August 20, 2026 Respectfully submitted,

/s Grace Jun
**GRACE JUN**
*Attorney for Plaintiffs* ESTATE OF ABDUL KAMARA and FREDRIKA NABBIE